## 9937

### KENAN, McKAY & SPIER v. YORKVILLE COTTON OIL CO.

(96 S. E. 524.)

1. SALES—CONSTRUCTION—QUANTITY.—An agreement by cotton oil manufacturing concern to sell a season's output of linters construed to contain no implied agreement to sell 400 bales thereof, where contract estimated output at "about 400 bales;" it being improbable that company would bind itself against all odds to supply so great an amount of a by-product.

2. CONTRACTS—CONSTRUCTION OF CONTRACT.—Where an agreement relating to "about 400 bales" of linters qualifies amount by words "season's output," the latter provision, being more specific, will govern, and contract will be construed one to affect "season's output," and not 400 bales.

3. CONTRACTS—MUTUALITY—RIGHTS OF PARTIES.—One who contracts to buy "season's output" is bound to purchase all thereof, although it exceeds estimate of amount made by contract, and although seller is bound to sell only season's output, although amount thereof falls short of estimate; the nature of such an agreement rebutting notion of strict mutuality.

4. TRIAL—PROVINCE OF COURT—SUBMISSION OF ISSUE TO JURY.—Failure to submit to jury question of whether a company acted in good faith in complying with contract to sell season's output of linters was not error, where evidence on such issue was susceptible of only one conclusion.

Before MOORE, J., York, Summer term, 1917.  Affirmed.

Action by Kenan, McKay and Spier against Yorkville Cotton Oil Company. From judgment for defendant, plaintiffs appeal.

The following is the contract:

Atlanta, Ga., 7-19-1915.   Sold to Messrs. Kenan, McKay & Spire, Atlanta, Ga.   For account—The Yorkville Cotton Oil Company, Yorkville, S. C.   Amount—Season's output of cotton linters for season 1915-1916, about four hundred (400) bales, to be grade mill run, made from sound seed and free from country damage. Price—Four and one-eighth cents (4⅛c) per lb., f. o. b. Yorkville, S. C.   Shipment—For shipment in 25 to 50-bale lots as made.   Terms—Sight draft free of exchange with bill of lading attached. Sellers to pay brokerage.   Notice—We cut 60 to 70 pounds lint to ton of seed.   Peoples & Field, Brokers.   Accepted: Yorkville Cotton Oil Company, W. H. Fowler, Secy. and Treas.

George E. Spier, one of the plaintiffs, being duly sworn, testified as follows:

Direct examination by Mr. Lewis: Q. Mr. Spier, you are the Spier mentioned in the caption of this case here, as a member of this corporation, Kenan, McKay & Spier? A. I am. Q. (hands witness papers): Will you please state what those papers are that I hand to you? A. These papers consist of copies of bills of lading, original invoices, original detail weights and original drafts furnished Kenan, McKay & Spier by the Yorkville Cotton Oil Company covering shipments of a bill of 155 bales of linters. Q. From what period to what period were those linters shipped to you? A. They were shipped beginning October 12, 1915, at the rate of 25 bales per week up to and including November 24, 1915. Q. Were any more linters shipped you after that? A. No, sir. Not from this mill. (Papers offered in evidence marked Exhibit B, 1 to 6, inclusive.) Q. Mr. Spier, this invoice

that I show you here, is that written as it was when it was received by you? A. Yes, sir. Q. And that was received in due course of mail? A. Yes, sir. (Invoice marked Exhibit B 1, dated November 24, 1915.) Q. Mr. Spier, will you state whether or not any other reason was ever given to the plaintiffs in this case why the defendant, the Yorkville Cotton Oil Company, refused to ship you linters further? A. No reason given further, no other reason. Q. Other than one? A. Other than that one reason there. Q. Mr. Spier, how long have you been connected with the oil mill business as a purchaser of linters? A. Since the fall of 1902. Q. Fifteen years? A. Yes, sir. Q. That contract provides for the season of 1915-1916. State when the season commences and when it ends. A. It has always been the custom of the trade that the season began September 1st and ended August 31st of the following year. Q. As I understand in this case, you received no linters from the defendant after November 24, 1915? A. None whatever. Q. Mr. Spier, I believe you have already stated that they were delivering linters to you at the rate of about 25 or 50 bales per month? A. No, sir; per week. Q. Assuming that as a fair basis of capacity, what ought that mill to have delivered to you during the entire season? Mr. Hart: I object. He don't know what the mill was manufacturing there. He don't know anything about it. The Court: Yes, sir. That is a mere matter of calculation for the jury. Q. Mr. Lewis: I will not push the question. Q. All the linters that were shipped you, you paid for? A. Yes, sir. Q. Did you stand ready to pay for the others as they should be shipped to you? A. Yes, sir. Q. And I believe you say none other were ever shipped? A. None at all. Q. You received 155 bales altogether? A. Yes, sir. Q. Mr. Spier, what is the weight of a commercial bale of linters? A. Five hundred pounds, sir. Q. Five hundred pounds.

*Messrs. Payne & Jones, of Atlanta, Ga., and W. W. Lewis* and *J. A. Marion,* both of York, for appellants.   *Mr., J. A. Marion* submits: *That they called for approximately four hundred bales:* 71 E. C. L. 273; 16 Q. B. 274; 96 U. S. 168; 24 Law Ed. 622; 36 Cyc. 205, and cases cited: 196 U. S. 163; 49 Law Ed. 428; 115 U. S. 288; 29 Law Ed. 366; 39 S. E. 471; 89 A. D. 3838; 110 Pacific 1088; 186 U. S. 284; 46 Law Ed. 1167; 6 Sup. Ct. Rep. 12; 12 Ann. Cases 29; 27 Mo. 563.   *Contract contemplated the operation of respondent's mill for the full season 1915-1916:* 3 L. R. A. 859; 4 L. R. A. 392; 12 Cyc. 1086; 115 U. S. 188; 96 U. S. 168; 24 Law Ed. 622; 15 L. R. A. 218; 28 N. Y. (Supp.) 73; 49 L. R. A. 594; 19 L. R. A. 127; 14 C. B. N. C. 6654; 110 Ill. 428; 86 N. W. 344; 9 Cyc. 330; 61 L. R. A. 402; Ann. Cases 1913b; 194 Fed. 69; 2 Crompton 61.   *The Court erred in holding that the defendant operated its mill in good faith, and discharged itself from liability from further operation, and in not submitting this question to the jury:* 20 Ann. Cases 1002; 61 Ark. 315; 32 S. W 1081; 7 Ark. 123; 82 Ala. 302; 2 So. 911; 3 Paige on Contracts, par. 1440; 77 Ark. 116; 91 S. W. 27; 51 L. R. A. 954; Ann. Cases 1915d, 842; 12 N. Y. 108; 2. N. Y. 154; 9 Cyc. 762; 98 S. C. 125; 92 S. C. —; 95 S. C. 32; 97 S. C. 331; 107 S. C. 511.

*Messrs. Payne & Jones* cite: *As to construction of contract:* 96 U. S. 168-171-172; 2 Cromp. M. & R. 61; 93 S. W. ('Tex.) 515; 74 N. Y. 596; Am. & Eng. Cases 1913b, 848; 72 N. C. 99; 38 App. (D. C.) 151; 86 N. E. (Ill.) 1055; 146 Fed. 449, 451; 169 Fed. 582; 93 S. W. (Tex.) 515; 74 N. Y. 896; 9 Cyc. 227; 9 Cyc. 329; 160 Ill. 85; 31 L. R. A. 529; 3 L. R. A. (N. S.) 706; 155 Fed. 77; 11 L. R. A. (N. S.) 713, and note, citing cases; 200 Fed. 529; 43 L. R. A. (N. S.) 730, and note, citing cases; 194 Fed. 69; 96 U. S. 168; 3 L. R. A. (N. S.) 709; 93 S. W. ('Tex.) 515; L. R. 6; Q. B. 463; 134 Cal. 21; 53 L. R. A. 681; 9

Ga. App. 691, 694, 695 (Cal.); 53 L. R. A. 681 (N. Y.); 14 L. R. A. 215 (Or.); 21 L. R. A. 726; 22 Pa. Super. Court 347; 2 Wall., 17 L. Ed. 762 (Or.); 21 L. R. A. 726; note to 53 L. R. A. 68, and cases cited; 11 L. R. A. (N. S.) 713. *As to the duty of defendant to deliver to plaintiff approximately four hundred bales:* 96 U. S. 168; 93 S. W. (Tex.) 515; 11 Ga. App. 164, 165; 35 Cyc. 207, and cases cited; 107 U. S. 437 (Fed.); 43 L. R. A. (N. S.) 730. *As to failure of defendant to operate its mill:* 96 U. S. 168; 155 Fed. 77; 9 Cyc. 627, 628, *et seq.,* citing cases.

*Mr. Jno. R. Hart,* for respondent, submits*: That the contract on the part of the defendant was to deliver its entire output of cotton linters for the season 1915-1916, and that the words "about four hundred bales" were a mere estimate and did not bind the defendant to deliver four hundred bales; that defendant fully carried out its contract when it delivered its entire output, one hundred and fifty-five bales:* 194 Fed. Rep. 69; 225 U. S. 706; 32 N. Y. 154-161; 52 Iowa 417-419; 3 N. W. 467; 96 U. S. 171; 93 S. W. Rep. 515 (Texas Civ. Appeals); 26 N. E. Rep. 1055; 141 Ill. App. 603; 38 App. D. C. 1313; 146 Fed. 49; 76 C. C. A. 659; 35 Cyc. of L. & P. 207; 96 U. S. 168; 35 Cyc. L. & P. 208; 74 N. Y. 596; 63 N. C. 72.

March 23, 1918.

The opinion of the Court was delivered by MR. JUSTICE GAGE.

Action for breach of contract; order of nonsuit; appeal by the plaintiff.

The contract is a skeleton one, in writing, and was drawn by an Atlanta broker mediately for the plaintiffs on one side and the defendant on the other. Let the evidence of it be reported.

The question in the case is the meaning of the contract. Under it the defendant shipped to the plaintiff 155 bales of linters, and that was confessedly the total output of the oil company for the season. The defendant says that was a performance of the contract. The plaintiff says that the defendant was bound by the contract to operate the oil plant, and in order to supply the plaintiff with 400 bales of linters; and the plaintiff sues for the failure of the defendant to furnish 245 other bales. And that is the issue to be decided. It is true that if the defendant agreed with the plaintiffs to sell to them 400 bales of linters at all hazards, then a failure to do so is a breach of the contract for which the defendant has rendered no lawful excuse. But the instant case is not of that character. It is manifest from the face of the contract, and it must have been so manifest to the plaintiffs, that the defendant's chief business is the crushing of cotton seed, and that the making of linters is a by-product of that business. It is altogether plain that the defendant did not by express words bind itself to operate the plant throughout the whole season. If, therefore, it was bound to do that, in order to produce 400 bales of linters, such an obligation rested in an implied contract to do so. It is true that:

"Whatever may fairly be implied from the terms or nature of an instrument is in judgment of law contained in it." 6 R. C. L., p. 856.

Bishop states the rule thus:

"From an express undertaking, the law will also imply whatever the parties may be reasonably supposed to have meant, and what is essential to render the transaction fair and just." Bish. on Con., p. 37.

It was said by a New York Court that an implied agreement "is to be raised only to enforce a manifest equity, or to reach a result which the unequivocal acts of the parties

indicate that they intended to effect." *Genet v. President of Delaware & H. Canal Co.,* 136 N. Y. 609, 32 N. E. 1082, 19 L. R. A. 127.

So the inquiry is, Did the cotton oil company reasonably intend to bind itself to operate its mill at all events in order to turn out a by-product? Its chief business was to crush seed and make cotton oil and cake. So much is not said in the testimony, but it is a matter of common knowledge, about which we will not profess ignorance. It took a ton of seed to make 60 or 70 pounds of "linters;" a bale of linters contained 500 pounds (see contract and testimony of Spier). The cotton oil company would, therefore, have had to crush about 3,000 tons of seed to produce 400 bales of linters. It is not to be reasonably supposed that the cotton oil company intended or would have bound itself against all odds to crush so much seed in order to supply a by-product of linters; for producing linters was but an incident to the business of crushing cotton seed. It is not sufficient that the buyers intended so much; the seller must also have reasonably intended it. So much for the implications of the contract, and we now turn to the expressions of it.

The books say "there can be no implication as against the express terms of the contract." 13 C. J., p. 559. And "the implication must be found in the language of the contract." *Maryland v. Railroad,* 22 Wall. 111, 22 L. Ed. 713. And "there is a well recognized distinction between the expectation of the parties to a contract and the duty imposed by it." *Knox v. Lee,* 12 Wall. 457, 20 L. Ed. 287. The expressions in the instant contract leave small room for implications. The rule by which to interpret a contract phrased like the instant one is well stated in *Brawley v. United States,* 96 U. S. 172, 24 L. Ed. 622, a case cited by and relied upon by the appellants. The Court there stated the rule in these words:

"Where a contract is made to sell * * * certain goods, identified by reference to independent circumstances, such as * * * all that may be manufactured by the vendor in a certain establishment * * * and the quantity is named with the qualification of 'about' * * * the contract applies to the specific lot."

That opinion plainly makes for the respondent. The words in the instant case, "about 400 bales," are controlled and qualified by the more specific words "season's output," so that the buyer must have taken the season's output even though it should measurably exceed 400 bales.

So much was decided in the Texas case cited also by the appellant; the controlling words there were held to be output, and not a suggested number of bales. *Loeb v. Winnsboro Cotton Oil Co.* (Tex. Civ. App.), 93 S. W. 515. If the buyer must take the "output" though it exceeds the estimate, he must also be content with it though it falls short of the estimate. The buyer is bound to take the output, because he agreed to that; the seller is not bound to furnish more than the "output," because he has only agreed to furnish that much.

It is suggested by the appellant that the contract must be mutual. But that is not so where the parties have agreed otherwise, and where the nature of the agreement rebuts a notion of strict mutuality. Bish. on Contracts, sec. 589. In the same case of *Brawley v. United States,* the Court uses this language: "So where a manufacturer contracts * * * at a certain price all the articles he shall make in his factory for the space of two years, 'say a thousand to twelve hundred gallons of naphtha per month,' the designation of quantity is qualified not only by the indeterminate word 'say,' but by the fair discretion or ability of the manufacturer, always provided he acts in good faith. This was the precise decision in *Gwillim v. Daniell,* 2 Cromp., M. & R. 61, where Lord Abinger says: 'The agree-

ment is simply this, that the plaintiff undertakes to accept all the naphtha that the defendant may happen to manufacture within the period of two years. The words, "say from one thousand to twelve hundred gallons (per month)" are not shown to mean that the defendant undertook, at all events, that the quantity manufactured should amount to so much. If by fraud the defendant manufactured less than he ought to have done, the breach should have been shaped accordingly. Here it does not appear that, in the ordinary course of his manufacture, the defendant ought to have produced a larger quantity than he has done; and we cannot, therefore, say that he has broken his contract.' "

The cases are numerous, and the contracts they construe are of great diversity, and the Courts conclude variously; it would be an idle task to review a fraction of them. It is sufficient to say our judgment is against the view of the appellant, and with that of the Circuit Court. See *Bautovich v. Great Southern Lumber Co.,* 129 La. 857, 56 South. 1026, Ann. Cas. 1913b, 848; *Burt v. Garden City Sand Co.* 237 Ill. 473, 86 N. E. 1056; *Little Rock Cooperage Co. v. Gunnels,* 82 Ark. 286, 101 S. W. 729, 12 Ann. Cas. 294.

A possible modification of this conclusion is suggested in the Brawley case and the English case which it quotes. If the cotton oil company for sinister reasons had concluded not to operate its plant, it might not lawfully shelter itself from liability behind that act of bad faith. But the testimony does not make such a case, and there is no warrant to decide it. The appellant thinks that issue ought at least to have been sent to the jury. The testimony, though, leaves only one reasonable conclusion thereabout. The plaintiff proved that the reason the plant was not operated was for the lack of money and the inability to borrow it, and the plant would have been operated if money could have been had. There is not a suggestion to the contrary. It is contrary, too, to the reason of the case, that the cotton

oil company would forego crushing seed and making oil and cake in order to curtail its by-product of linters.

The judgment of the Circuit Court is affirmed.

MR. CHIEF JUSTICE GARY and MESSRS JUSTICES WATTS and FRASER concur.

MR. JUSTICE HYDRICK dissents.