18478

COMMERCIAL CREDIT CORPORATION, Respondent, v.
NELSON MOTORS, INC., Appellant

(147 S.. E. (2d) 481)

*Messrs. Robinson, McFaddin & Moore,* of Columbia, *for Appellant,*

*J. Reese Daniel, Esq.,* of Columbia, *for Respondent,*

March 16, 1966.

BRAILSFORD, Justice.

This is an action by Commercial Credit Corporation against Nelson Motors, Inc. to recover Commercial's loss on certain contracts or mortgages securing the credit portion of the purchase price, including finance and insurance charges, of automobiles purchased from Nelson by retail customers. These installment contracts, referred to in the record as security instruments, had been assigned to Commercial at a discount by Nelson, pursuant to a written contract dated March 29, 1962, prior to the execution of the contract sued upon.

The circuit court struck portions of defendant's answer as sham and frivolous and the defendant has appealed.

The complaint alleges that Nelson was obligated by the terms of a contract dated July 1, 1963, styled "Repurchase Agreement," to purchase from Commercial any automobiles repossessed under security instruments theretofore purchased from Nelson, after the exhaustion of reserves, at the "net unpaid balance" owing Commercial, which Nelson refused to do. The complaint seeks judgment against Nelson for the balance due Commercial after public sale of the automobiles by it and application of the proceeds therefrom to the installment contracts. The agreement of July 1, 1963, was made a part of the complaint and attached thereto as an exhibit.

In pertinent part, the answer of Nelson alleges that under the contract sued upon, and under other contracts between the parties extending over a number of years prior to July 1, 1963, it was the duty and obligation of Commercial "to service the accounts purchased by, and assigned to, it, and to use reasonable and normal diligence to collect the balances due * * *." After July 1, 1963, according to the answer, Commercial "ceased to use the care and diligence it had formerly employed * * *, and failed entirely to perform its obligations under the agreements to use reasonable care and diligence to collect such balances." And the answer alleges that the losses sustained by Commercial were caused by its failure to perform its obligations in these respects.

The answer also sets up a counterclaim based upon the same omissions of duty by Commercial, which are alleged to have resulted in loss to Nelson of $40,705.63 through the depletion of reserves which otherwise would have accrued to it.

Commercial's motion to strike as sham and frivolous was directed at the foregoing defense and counterclaim. The motion was supported only by an affidavit of the manager of Commercial's Columbia office, with attached copies of the contract of March 29, 1962, styled "No Liability Resale

Agreement," and amendment thereto of the same date, pursuant to which the security instruments had been assigned to Commercial.

This affidavit challenges the truth of the allegations sought to be stricken only so far as the answer avers that it was the duty of Commercial, under the agreements between the parties, to service the accounts assigned to it and to use reasonable diligence to collect the payments becoming due thereon. As to this, the office manager deposes that none of the contracts between Commercial and Nelson "ever placed any duty to make any collections, with or without diligence, upon" Commercial.

In opposition to the motion to strike, Nelson presented an affidavit by one J. P. Wilson, who had been its sales manager since 1953, to the following effect.

Commercial and Nelson had done business together as finance company and automobile dealer, respectively, since prior to 1953. During this period, pursuant to a series of contracts, usually styled "No Liability Resale Agreements," Nelson assigned to Commercial at a discount installment paper taken from its credit purchasers. Under these contracts, reserve accounts amounting to many thousands of dollars were built up to take care of any losses on defaults, and Nelson was not obligated to Commercial for losses beyond *pro tanto* application of the reserves accumulated by Commercial to Nelson's account. In 1963, the current contract between the parties was supplanted by the "Repurchase Agreement" of July 1, 1963, on which this action is based. Quoting now from the affidavit:

"Prior to this Repurchase Agreement of July 1, 1963, Commercial Credit Corporation had always had its representatives out collecting on these credit instruments that it had purchased from Nelson Motors, Inc. and, of deponent's own knowledge, these representatives made every effort to see that these security instruments were paid in full. Over the years, deponent has had many contacts with these representa-

tives, who were making diligent efforts to collect any balances that were in arrears on these security instruments.

"From the course of dealings between Nelson Motors, Inc. and Commercial Credit Corporation over these years, any security instrument that was sold to, and purchased by, Commercial Credit was with the understanding that Commercial Credit Corporation would look after the collection of the installments due on these instruments."

The "Repurchase Agreement" of July 1, 1963, is in the form of a memorandum from Nelson to Commercial and deals only with customer contracts which had been sold to Commercial pursuant to the agreement of March 29, 1962. Reserves in excess of $10,000.00 had accumulated on these accounts. (Inferentially from the counterclaim, the figure was $40,705.63.) In consideration of the payment to it of the accumulated reserves above $10,000.00, Nelson agreed that should Commercial "repossess or recover any cars covered by said Instruments, for any reason, we will, upon delivery to us at our place of business shown above, repurchase such cars, as is, from you, for cash, after reserve left has been depleted." This promise was subject to the condition, with certain exceptions which need not be stated, that such cars be tendered to Nelson "within Ninety (90) days after the maturity of the earliest installment in respect thereto unpaid at the time of such delivery * * *," in which case Nelson would pay therefor "the net unpaid balance" due Commercial. Otherwise, Nelson agreed to purchase repossessed cars at the "wholesale value mutually agreed upon." In either event, Commercial agreed to defray the expense of repairing collision damage on any repossessed car purchased by Nelson. Nelson waived "presentment, protest and demand and notice * * *" and agreed that Commercial might "without notice to us and without our consent, refinance, rewrite, renew or extend any Instrument without affecting our obligations under this agreement."

As is seen from the foregoing summary of its terms, the contract does not by express language impose an obligation

on Commercial with respect to servicing and collecting the accounts assigned to it. On the other hand, the agreement confers unlimited authority on Commercial to deal with the obligors, without releasing Nelson, and provides no opportunity for Nelson to protect its own interest by stimulating payments. Commercial is granted unlimited discretion to insist on payment according to terms of the various installment contracts, or, without notice to or consent by Nelson, to extend the time for payment of any installment, or to bargain anew wih the obligors and formulate new and different terms of payment.

The circuit court held that the rights of the parties were controlled by the terms of the written contract, which did not impose any obligation on Commercial with respect to the collection of the assigned accounts; therefore, the defense and counterclaim rested upon a non-existent duty and should be stricken as sham.

Nelson contended in the circuit court, and urges here, that under the terms of the contract, in the light of the attendant facts, including the relationship and prior dealings between the parties, there was an implied obligation by Commercial to employ reasonable and normal diligence toward the collection of the assigned accounts. Under the view which we take of the case, the appeal turns on whether the record presents a substantial issue as to whether such an obligation arose by implication. If so, it was error to grant Commercial's motion to strike the defense and counterclaim on the ground assigned. A motion to strike an answer or defense as sham is referable to Section 10-654, Code of 1962, and may be granted only where the pleading is manifestly false and not interposed in good faith but as a mere pretense. *Blackwell v. United Insurance Company of America,* 229 S. C. 296, 92 S. E. (2d) 702; West's South Carolina Digest, Pleading,—359.

Although implied covenants are not favored in the law, Nelson's reliance is upon the settled principles that noncontradictory terms may be implied in a

contract in order to effectuate the manifest intention of the parties when the circumstances warrant it, and that there exists in every contract an implied covenant of good faith and fair dealing. 17A C.J.S. Contracts § 328; 17 Am. Jur. (2d) Contracts, Sec. 255, 256; 4 Williston on Contracts, 3d ed., Sec. 610B; 5 Id., Sec. 670.

We quote from 17A C.J.S. Contracts § 328, pages 282-284:

"A contract includes not only what is expressly stated but also what is necessarily to be implied from the language used and external facts, such as the surrounding circumstances; and terms which may clearly be implied from a consideration of the entire contract are as much a part thereof as though plainly written on its face.

"In the absence of an express provision therefor, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made. * * *"

And from 17 Am. Jur. (2d) Contracts, Sec. 255, pages 649-650:

"* * * The policy of the law is to supply in contracts what is presumed to have been inadvertently omitted or to have been deemed perfectly obvious by the parties, the parties being supposed to have made those stipulations which as honest, fair, and just men they ought to have made. * * *"

"It has been said that implied promises always exist * * * where the covenant on one side involves some corresponding obligation on the other; where, by the relationships of the parties and the subject matter of the contract, a duty is owing by one not expressly bound by the contract to the other party in reference to the subject thereof. * * *"

Williston expounds the applicable principles in his work on Contracts, 3d ed., in Section 610B. "Intent of the Par-

ties; Provisions Implied in the Writing." Among a number of illustrative decisions, he discusses the often cited case of *Wood v. Lucy, Lady Duff-Gordon*, 222 N. Y. 88, 118 N. E. 214, in which the admirable opinion was written by Justice Cardozo. We quote:

"In a leading case, the defendant expressly promised not to market her fashion designs and indorsements through any other than plaintiff. * * *" But (she) * * * placed her indorsement on the fabrics, dresses, and millinery without plaintiff's knowledge, and withheld profits. Plaintiff sued defendant for damages, and the case came to the court of appeals on demurrer. The upper court reversed and said:

" 'The agreement of employment is signed by both parties. It has a wealth of recitals. *The defendant insists, however, that it lacks the elements of a contract. She says that the plaintiff does not bind himself to anything.* It is true that he does not promise in so many words that he will use reasonable efforts to place the defendant's indorsements and market her designs. We think, however, that such a promise is fairly to be implied. The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be "instinct with an obligation," imperfectly expressed. If that is so, there is a contract.' " Williston on Contracts, 3d ed., Sec. 610B, p. 543.

See also *Palisades Properties, Inc. v. Brunetti*, 44 N. J. 117, 207 A. (2d) 522, 531; *Perkins v. Standard Oil Co.*, 235 Or. 7, 383 P. (2d) 907, 1002; *Genet v. Delaware and H. Canal Co.*, 136 N. Y. 593, 32 N. E. 1078; *Warfield Natural Gas Co. v. Allen*, 248 Ky. 646, 59 S. W. (2d) 534, 91 A.L.R. 890.

In *Kenan, McKay and Spier v. Yorkville Cotton Oil Co.*, 109 S. C. 462, 96 S. E. 524, 1 A.L.R. 1387, although the case turned the other way on the facts, this court recognized the doctrine invoked by Nelson and quoted with

approval consistent excerpts from Ruling Case Law and Bishop on Contracts. We applied these principles to appropriate facts in *Hill v. Polar Pantries,* 219 S. C. 263, 64 S. E. (2d) 885, 25 A.L.R. (2d) 1080, as is shown by the following brief quotation:

"Finally it is argued that appellant did not contract to supervise the job. It is true that there is no express stipulation to this effect but we think this obligation may be fairly implied. This was the interpretation which the parties themselves placed upon the contract." 64 S. E. (2d) 888.

The contract of July 1, 1963, deals almost exclusively with the rights and liabilities of the parties after repossession of cars from the obligors on the installment contracts. It specifies Nelson's executory obligation upon the tender of a repossessed car, but it is mute as to the agreement between the parties for collecting and promoting orderly payments of the accounts. Although no obligation is expressly imposed, unlimited authority and discretion are conferred on Commercial to deal with the obligors, without notice to or consent by Nelson. Yet, Nelson had the greater pecuniary stake in the successful collection of the accounts.

Without going into further detail, we are satisfied that under the terms of the contract in the light of surrounding circumstances, including the relationship of the parties and their past dealings, it is, to say the least, fairly arguable that Commercial was impliedly obligated to pursue the collection of the accounts with reasonable and customary diligence. Hence, we would not be justified in concluding that the defense and counterclaim are manifestly false and not pleaded in good faith. Since no provision of the written contract touches on this important subject, which is necessarily involved in the contractual relations of the parties, evidence as to prior dealings between them would involve no contradiction of the writing and would not violate the parol evidence rule. *Chatfield-Woods Co. v. Harley,* 124 S. C. 280, 117 S. E. 539; *Soulios v. Mills Novelty Co.,* 198 S. C. 355, 17 S. E. (2d) 869.

Reversed and remanded for further proceedings consistent herewith.

Moss, Lewis and Bussey, JJ., concur.