# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Road, LLC and Pinckney Point, LLC, Plaintiffs,
of which Road, LLC is the Petitioner,

v.

Beaufort County, a political subdivision of the State of
South Carolina, Respondent.

Appellate Case No. 2021-000625

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Beaufort County
Carmen T. Mullen, Circuit Court Judge

---

Opinion No. 28204
Heard April 18, 2023 – Filed May 15, 2024

---

## AFFIRMED IN RESULT

---

George Trenholm Walker and John Phillips Linton, Jr.,
both of Walker, Gressette & Linton, LLC, of Charleston,
for Petitioner.

C. Mitchell Brown and Allen Mattison Bogan, both of
Nelson, Mullins, Riley & Scarborough, LLP, of
Columbia; Robert W. Achurch III, of Howell Gibson &
Hughes, PA, of Beaufort; and Mary Bass Lohr, of Parker
Law Group, LLP, of Hampton, all for Respondent.

**JUSTICE FEW:** This case concerns the scope of the covenant of good faith and fair dealing we held long ago is implied in every contract. Today we hold a party's obligations under such an implied covenant are tied to the rights and duties the parties agreed upon in the contract and the covenant may not be relied upon to create new duties not expressly stated or otherwise implied. Our holding requires we uphold the trial court's decision to grant judgment notwithstanding the verdict to the defendant. We affirm the court of appeals in result.

## I.     Background

This case arises out of an attempt to develop a prime 229-acre peninsula of waterfront real estate in Beaufort County. The developer purchased the peninsula with a combination of cash and a purchase-money loan secured by a mortgage. Before beginning the development, however, the developer needed to resolve two disputes concerning its only access road, which runs across a narrow isthmus to the peninsula. First, several neighboring landowners claimed they owned a .85-acre parcel of land the access road crossed just before reaching the peninsula, and they refused to provide the developer the right to use it. As to this first dispute, Beaufort County contended the entire access road was a public road. Second, Beaufort County denied the developer's request for a zoning variance necessary to relocate and improve the access road. The two lawsuits arising from these disputes are referred to by the parties as the "road action" and the "variance action." There is no dispute that the developer's ability to relocate, improve, and use the access road was essential to the success of the development.

The developer, the neighboring landowners, and Beaufort County settled both lawsuits in a written "Settlement Agreement" filed in the Beaufort County Court of Common Pleas under the caption of both lawsuits. Beaufort County expressly promised in the Settlement Agreement to consent to an order declaring the end of the access road to be private and to grant the developer the necessary zoning variances to relocate and improve it.

The key to reaching the Settlement Agreement, however, was Road, LLC, which was not a party to either lawsuit.[1] During the negotiation of the Settlement Agreement, the developer did not have sufficient funds to purchase the .85-acre parcel at the end of the access road, and the purchase of the parcel was a necessary step to getting the neighboring landowners to join the Settlement Agreement. Road, LLC—which we will most often refer to simply as "Road"—stepped in. In separate agreements, Road agreed to pay $1.3 million to the neighboring landowners to purchase their interests in the end of the access road, and the developer agreed to purchase the same parcel from Road for $5 million upon completion of the development. Pursuant to those two agreements, Road stood to make a profit of $3.7 million if the developer was able to complete the project.

Eventually, the developer defaulted on its purchase-money loan and its lender took title to the peninsula. The developer did not give up, however, and obtained several options from the lender to repurchase the peninsula if the developer gained additional financing. After the options finally expired, Beaufort County purchased the peninsula from the lender for the stated purpose of preventing its development. Road contends all parties to the settlement agreement contemplated the peninsula would eventually be developed—even if the initial developer was unable to complete the project—and Road would at that time sell the .85-acre parcel to the successful developer for a profit. Road contends Beaufort County breached the implied covenant of good faith and fair dealing in the Settlement Agreement by purchasing the peninsula, and thereby extinguishing any opportunity Road might later gain to sell the .85-acre parcel to another developer.

### A.     The Land

Members of the Pinckney family owned and farmed prime real estate near Bluffton—just a few miles northwest of Hilton Head Island—from about 1909. The jewel of the family's property was the 229-acre peninsula, which is surrounded on three sides by the deep water of the Okatie and Colleton Rivers—saltwater tidal rivers that connect by water to the Chechessee River, then the Broad River, Port Royal Sound, and ultimately the Atlantic Ocean. The peninsula is connected by land

---

[1] The Settlement Agreement provided, "Road, LLC is not a party to the Actions but is an interested party and joins this Agreement for the purposes of expressing its agreement to the easements and conveyances described herein . . . ."

to the mainland of Beaufort County only by a 155-foot-wide isthmus. Pinckney Colony Road crosses the isthmus, providing the only vehicular access to the peninsula from U.S. 278—Fording Island Road—which is the main road to Hilton Head from I-95. The property was described at trial as being shaped like a tennis racket, with the peninsula as the head of the racket and the isthmus as its throat.

As of 2005, John and Nancy Pinckney owned the 229-acre head of the racket—the peninsula. John's half-brother John David Pinckney and John David's wife Agnes Pinckney claimed they owned the .85-acre parcel in the throat of the racket at the end of Pinckney Colony Road—the access road.[2] As the development effort giving rise to this litigation unfolded, everyone referred to peninsula as the "point tract" and the .85-acre parcel at the end of the access road as the "road parcel." From this point, we will refer to the two properties by those names.

## B.     The Attempted Development

In 2005, Stokes Land Group entered into a contract to purchase the point tract from John and Nancy Pinckney for $15.6 million. Because of the dispute over the access road and pending road action, however, Stokes Land Group and the Pinckneys agreed to reduce the purchase price of the point tract by $5 million. Stokes Land Group then created Pinckney Point, LLC, which purchased the point tract in March 2006 for $10.6 million. Pinckney Point paid $5.7 million in cash and borrowed the rest of the purchase price from BB&T. After the purchase, Pinckney Point applied for a variance to relocate the access road out of protected wetlands to an area more suitable for water and sewer lines under the road. The County Zoning Board of Appeals denied the variance request, and Pinckney Point appealed the decision to circuit court in what became known as the variance action.

In 2010, BB&T initiated foreclosure proceedings on the point tract because Pinckney Point was in default on its loan. The parties signed and filed the Settlement

---

[2] Another one of the "neighboring landowners" referred to above is Dorothy P. Gnann, who apparently owned a .11-acre portion of the access road adjacent to the parcel claimed by John David and Agnes Pinckney. The record it not clear whether the Gnann portion was part of, or in addition to, the .85-acre parcel which we now refer to as the "road parcel," but it makes no difference to the analysis or outcome of this appeal.

Agreement in January 2011. After the Settlement Agreement was signed, BB&T sold its note and mortgage on the point tract to Equity Resource Partners (ERP). In December 2011, Pinckney Point deeded the point tract to ERP in lieu of it foreclosing on the mortgage. ERP sold Pinckney Point a one-year option to repurchase the property for $6.5 million. The option was extended, but it ultimately expired on March 11, 2013.

## C.    Beaufort County Purchase

As Pinckney Point searched for additional financing and negotiated with ERP to extend the option period yet again in late 2012, a local real estate broker showed the point tract to Garett Budds, a representative of the Beaufort County Rural and Critical Lands Preservation Program. The Lands Preservation Program is a Beaufort County initiative to conserve local land with high environmental value, and in general it preserves land either by acquiring it outright or by purchasing a conservation easement. At trial, Beaufort County conceded Budds was its agent.

Budds toured the point tract for about an hour and a half in mid-November 2012. A representative of ERP was present and toured the property with Budds. Budds testified at trial he thought the point tract was "a fantastic property" that is "replete with natural resource value." In the "confidential" proposal he prepared proposing the Lands Preservation Program purchase the point tract, Budds wrote "protection of these parcels would complete protection of the Okatie River bend – a substantial accomplishment," and "Pinckney Point would be the 'crown jewel' of the Okatie/Colleton [Rivers area,] . . . a true eco-tourism attraction." Budds specifically noted, "The property currently has an approved master plan for a rural subdivision maximizing the waters edge and maritime forest – 77 units, 77 septic tanks, dozens of docks," and "Acquisition would protect property from pending development."

The Land Preservation Program heard the presentation on March 14—three days after Pinckney Point's option expired—and approved the purchase. Beaufort County entered a contract with ERP to purchase the point tract on April 24, 2013, and closed the sale on May 28, 2013.

## II.     Procedural History

Road, LLC and Pinckney Point, LLC filed this lawsuit against Beaufort County on May 21, 2013, alleging it breached the Settlement Agreement by—among other things—purchasing the point tract, thereby preventing its future development and extinguishing Road's opportunity to sell the road parcel to a developer at a profit.  At trial, Road presented the testimony of the Beaufort County Administrator, who stated, "I think the primary use that we wanted was to prevent the development of the property."

The jury found Beaufort County did not breach the Settlement Agreement as to Pinckney Point, LLC but it did breach the Settlement Agreement as to Road, LLC.  The jury awarded Road $5 million in damages.  The County filed a motion for judgment notwithstanding the verdict, arguing there was no breach of the Settlement Agreement—either its express terms or the implied covenant of good faith and fair dealing—and argued Road presented no evidence to support the jury's $5 million award.  The trial court granted the motion on both grounds.

The court of appeals affirmed on two grounds.  *Road, LLC v. Beaufort Cnty.*, 433 S.C. 164, 176-77, 857 S.E.2d 371, 377 (Ct. App. 2021).  First, it found there was no evidence Beaufort County was the proximate cause of Road's damages, an issue not raised by the County nor ruled on by the trial court.  433 S.C. at 176, 857 S.E.2d at 377.  Second, it determined the evidence "showed Road did not suffer $5 million in damages because Road's expert testified that the property was still worth $5 million after the County purchased the Point Tract."  433 S.C. at 176-77, 857 S.E.2d at 377.  "Thus," the court of appeals held, "the evidence presented at trial indicated the value of the property did not change."  433 S.C. at 176, 857 S.E.2d at 377.  The court of appeals did not address whether Beaufort County breached the Settlement Agreement, including the implied covenant of good faith and fair dealing.

We granted Road's petition for a writ of certiorari to address three issues.  However, we resolve the case on only one issue—the implied covenant of good faith and fair dealing.  We hold the trial court was correct to grant Beaufort County's motion for judgment notwithstanding the verdict on the basis that Beaufort County—as a matter of law—did not breach the Settlement Agreement by violating its implied covenant of good faith and fair dealing.  Therefore, we affirm the court of appeals in result. We will briefly discuss the two issues the court of appeals did address in section IV of the opinion.

### III. Analysis

Turning to the merits of the appeal, we begin by articulating Road's theory of Beaufort County's breach of the Settlement Agreement, in order to ensure we understand the theory before we determine its legal validity. This will also enable us to be precise as to our standard of review. We then turn to the legal question of whether Road presented a valid breach of contract claim.

### A. Road's Theory of Breach of Contract

In his closing argument to the jury, Road's trial attorney explained that Beaufort County committed "two main breaches" of the Settlement Agreement. The first is not important to this appeal. As to the second, counsel argued Beaufort County "went out and negotiated and purchased the point [tract], thereby preventing this [road parcel] from being an access to a residential subdivision as contemplated in the Settlement Agreement." In its brief and reply brief to this Court, Road argued "the County breached the implied covenant of good faith and fair dealing by preventing this two-tenths of a mile from being an access to a residential subdivision as contemplated in the settlement agreement." Road argued the Settlement Agreement contemplated the likelihood the initial developer would not complete the development and that a subsequent investor would complete it. Thus, Road argued, facilitating the development of the point tract—not only by the initial developer—was "the purpose for which the contract was made." Road argued Beaufort County "agreed to do and perform those things that, according to reason and justice, it should have done in order to carry out the purpose."

We view Road's theory as consistent from trial through oral argument at this Court. During oral argument, the Justices engaged Road's counsel in a discussion of the theory. Based on Road's closing argument to the jury, its arguments in its briefs, and the discussion at oral argument, we summarize the theory—attempting to frame it in the manner most favorable to Road—as follows: the parties to the Settlement Agreement contemplated not only that the initial developer would attempt to complete its effort to develop the point tract, but if that effort was not successful—a very likely prospect in view of the initial developer's financial limitations—another developer might eventually come in. In that event, the future developer would have to deal with Road for the use of the road parcel at the end of the access road. In light of these expectations, Road argues, Beaufort County was obligated to give Road a

fair opportunity to see if another developer would complete the project. Purchasing the point tract three days after the initial developer's option to repurchase it finally expired—for the purpose of preventing its development—was a breach of the Settlement Agreement because it violated that obligation.

We find the facts support Road's theory of breach. First, Road's intention to protect itself from the risk of Pinckney Point's failure is crystal clear. Road, LLC was created by Arendale Holdings, a previous business partner with Stokes Land Group. The fact Arendale Holdings created Road, LLC instead of investing directly with Stokes Land Group or Pinckney Point, LLC is an unmistakable indication Road sought to protect itself from the risk the initial developer—Pinckney Point—would fail by insisting it purchase and own the road parcel separately from Stokes and Pinckney Point.

Second, Beaufort County was aware of the potential for development of the point tract even after the impending failure of the initial developer. In fact, by the County's repeated admission, the very purpose of its purchase of the point tract was to prevent another developer from completing the project. In addition, the same paragraph of the Settlement Agreement quoted above in footnote 1 provides "all parties" acknowledged Road's agreement to purchase the road parcel "as consideration to bind the covenants and conditions and promises of the parties," thereby giving Road the benefits of the County's agreement to make the road private and the entitlement to the variances the County agreed to grant to relocate and improve the road. In his proposal to purchase the point tract—finalized after the initial developer lost its option to repurchase—Budds acknowledged the still "pending development." An attorney representing Road contacted Beaufort County after Road learned of Budds's proposal to purchase the point tract—before the County closed the sale—to inform the County of Road's position that the purchase would breach the Settlement Agreement because Road foresaw another developer completing the project.

Finally, despite Road's clear intentions and Beaufort County's knowledge of the likelihood of the initial developer's failure and the possibility of another developer stepping in, the County purchased the point tract with the stated purpose of preventing its future development.

These facts—and others—that support Road's theory of Beaufort County's breach of the Settlement Agreement render the question before us a pure question of law: can the Settlement Agreement be read to include an obligation on the part of Beaufort

County to not interfere with Road's fair opportunity to see if another developer would complete the project. *See Crenshaw v. Erskine Coll.*, 432 S.C. 1, 24-26, 850 S.E.2d 1, 13-14 (2020) (explaining that contract claims "must be based on the terms of the contract" and that "construing a contract" to determine what those terms are "is a question of law for the court"). We review questions of law with no deference to the trial court. *Callawassie Island Members Club, Inc. v. Dennis*, 425 S.C. 193, 198, 821 S.E.2d 667, 669 (2018).

### B.    Implied Contract Terms

We turn, therefore, to the legal question whether the Settlement Agreement may be read to impose such an obligation on Beaufort County. It is important to first clarify that this case is not about terms implied in a contract. Our courts have recognized the law will imply specific terms that are not expressed in a contract, but only under limited circumstances. *See Maccaro v. Andrick Dev. Corp.*, 280 S.C. 96, 100, 311 S.E.2d 91, 94 (Ct. App. 1984) ("Where an implied term is necessary to effectuate the intention of the parties, the law will supply it." (citing *Com. Credit Corp. v. Nelson Motors, Inc.*, 247 S.C. 360, 366-67, 147 S.E.2d 481, 484 (1966))); *S. Realty & Const. Co. v. Bryan*, 290 S.C. 302, 312, 350 S.E.2d 194, 199 (Ct. App. 1986) (finding a term was properly found to be implied in the contract). These implied terms are not the same as what we have referred to in modern cases as the "implied covenant of good faith and fair dealing."[3] In *Commercial Credit*—the first case in

---

[3] *Maccaro* is a good example of a case in which the court correctly refused to imply a specific term into a contract. There, Andrick agreed to sell the Maccaro sisters a condominium and to finance part of the purchase price. 280 S.C. at 98, 311 S.E.2d at 92-93. Their contract did not specify the terms of the mortgage the Maccaro sisters agreed to give Andrick to secure the loan. 280 S.C. at 100, 311 S.E.2d at 93. When Andrick backed out of the contract over a disagreement as to whether the sisters must agree to a "due on sale" provision in the mortgage, the sisters sued him for specific performance. 280 S.C. at 99, 311 S.E.2d at 93. Andrick defended the suit on the basis the contract "bound the Maccaros to comply with all reasonable terms of financing imposed by the seller," even though the contract for sale was silent as to the terms of a mortgage. *Id.* Judge Bell, writing for the court of appeals, acknowledged the law will sometimes imply terms "necessary to effectuate the intention of the parties," though such "implied terms are not favored in the law." 280 S.C. at 100, 311 S.E.2d at 94. "The unexpressed provision may be inferred from the language of the contract itself, or by looking to the external facts and circumstances

which we used the phrase "implied covenant of good faith and fair dealing"—we differentiated between terms implied in a contract and the implied covenant. 247 S.C. at 366-67, 147 S.E.2d at 484. In this case, however, there can be no implied terms because the parties to the Settlement Agreement specifically agreed it "contains the full and complete agreement between and among them" and "there are no oral or implied agreements or understandings which are not specifically set forth in this Agreement or in the exhibits thereto." When sophisticated parties such as Road and Beaufort County specifically provide there will be no implied terms read into their agreement, we will enforce that provision. Thus, Beaufort County's alleged obligation to not interfere with Road's fair opportunity to see if another developer would complete the project cannot be based on an implied contractual term. Rather, the alleged obligation must be based only on the implied covenant of good faith and fair dealing.

### C.     Implied Covenant of Good Faith

This conclusion, in turn, answers the legal question before us. The implied covenant of good faith and fair dealing cannot create new contractual duties not already expressed or implied in the contract. *See* 17A Am. Jur. 2d *Contracts* § 362 (2016) ("A duty of good faith must relate to performance of an express term of the contract and is not an abstract and independent term of a contract . . . ."). Rather, the implied covenant serves only to govern the manner in which parties to a contract enforce their existing contractual rights and carry out their existing contractual duties— express or implied. *See, e.g.*, *Com. Credit*, 247 S.C. at 366, 147 S.E.2d at 483 (requiring that an implied contractual obligation to collect payments on installment sales contracts be performed with "reasonable and normal diligence"); *Columbia E. Assocs. v. Bi-Lo, Inc.*, 299 S.C. 515, 520-21, 386 S.E.2d 259, 262 (Ct. App. 1989) (requiring a party to a contract "do those things that according to reason and justice should be done to carry out the purpose for which the contract was made" (citing *Com. Credit*, 247 S.C. at 367, 147 S.E.2d at 484)). We have addressed that "manner" in several other cases, as has our court of appeals. We find it unnecessary to discuss

surrounding the bargain, or by proving a general custom and usage of including certain terms as part of similar contracts." *Id.* The court found, "There is no language in the contract from which to infer an agreement that the mortgage terms would be those specified by the seller," and refused to find the term implied in the contract. *Id.*

those cases at length, because the point on which we decide this case is the implied covenant of good faith and fair dealing applies only to the manner in which a party may enforce its contractual rights and must carry out its already-existing contractual duties. The covenant may not be relied on to create new contractual duties not expressly stated or fairly implied in the contract itself.

Road makes one particular argument we will address regarding "the purpose for which the contract was made," citing *Columbia East* and other authorities. Road argues "the purpose of the Settlement Agreement was to facilitate the development of the Point Tract" and relies on instances in which it contends Beaufort County representatives testified in support of its argument. We discount Road's argument for two reasons. First, identifying the purpose of the contract is really part of the analysis of whether an unexpressed term should nevertheless be implied. In *Columbia East*, for example, the court of appeals construed a lease and implied a term in it to require the anchor tenant Bi-Lo to continuously operate a grocery store—or sublease the space if it ceased operations—to attract smaller shops for the benefit of the landlord. 299 S.C. at 521, 386 S.E.2d at 262. The court found, "The use of one or more anchor tenants to bring customers to the smaller shops in a shopping center is a common practice," and "We agree with the trial judge that . . . the parties intended that an operating supermarket would occupy the leased space." *Id.*

The second reason we discount Road's argument is the purpose of the contract is to be determined by the court construing its expressed terms, not by permitting witnesses to provide parol evidence of their unilateral personal views.[4] In this case, the Settlement Agreement is clear that the mutual purpose of parties in reaching the

---

[4] In *Columbia East*, the court of appeals relied on parol evidence, stating "we turn to extrinsic evidence in the record regarding the intent of the parties." 299 S.C. at 521, 386 S.E.2d at 262. As the court's ensuing discussion clearly indicates, however, it was seeking to determine the mutual intent of the parties, not the unilateral intent of the landlord. In this case, despite the contentions of Road, the testimony it relies on demonstrates only Road's unilateral intent. While we do not doubt the other parties were aware of Road's unilateral intentions, Pinckney Point certainly did not enter the Settlement Agreement for the purpose of having another developer complete its project. Likewise, we do not construe this Settlement Agreement as giving any indication Beaufort County had such a purpose.

Settlement Agreement was to settle the two lawsuits pending in circuit court. *See Rodarte v. Univ. of S.C.*, 419 S.C. 592, 603, 799 S.E.2d 912, 917 (2017) ("The parol evidence rule prevents the introduction of extrinsic evidence . . . to contradict, vary, or explain the written instrument." (quoting *Gilliland v. Elmwood Props.*, 301 S.C. 295, 302, 391 S.E.2d 577, 581 (1990))). The "recitals" prefacing the Settlement Agreement explain that the parties "wish to settle and resolve the [lawsuit regarding the road] and all matters in dispute concerning the unpaved road to and from the real property known as Pinckney Point," and "wish to also settle and resolve all matters in dispute concerning the relocation and improvement of a portion of the roadway located on the Point Tract . . . ." In addition, as stated above in note 1, the Settlement Agreement specifically provides that Road "joins this Agreement for the purposes of expressing its agreement to the easements and conveyances described herein," saying nothing of even Road having any purpose to prevent Beaufort County from interfering with Road's intentions in the event Pinckney Point failed to complete the development. These terms clearly indicate the mutual purpose of the parties to the Settlement Agreement is not as broad as Road suggests. *See Schulmeyer v. State Farm Fire & Cas. Co.*, 353 S.C. 491, 495, 579 S.E.2d 132, 134 (2003) (explaining courts must interpret a contract "according to the terms the parties used"); *N. Am. Rescue Prod., Inc. v. Richardson*, 411 S.C. 371, 378, 769 S.E.2d 237, 241 (2015) ("Interpretation of a contract is governed by the objective manifestation of the parties' assent at the time the contract was made, rather than the subjective, after-the-fact meaning one party assigns to it.") (citation omitted). We have no doubt all parties "contemplated"—as noted in the agreement—that Pinckney Point, LLC would develop the point tract, and we have already discussed that Road, LLC's unilateral purpose was clear to set itself up to profit even if another developer had to step in when Pinckney Point failed. Nevertheless, we do not read the Settlement Agreement as showing a mutual purpose of the parties to facilitate development of the point tract even in the event Pinckney Point was unable to do so.

This is not at all to say the purpose of the contract is irrelevant to a party's covenant of good faith and fair dealing. In *Columbia East,* for example, the court of appeals went beyond its finding of an implied term and stated, "We further find that the requirement of continuous operation is one of good faith." 299 S.C. at 521, 386 S.E.2d at 263. Here, however, the Settlement Agreement expressly forecloses the consideration of implied terms, and there are no express duties stated in the Settlement Agreement that could support an obligation on the part of Beaufort County to not interfere with Road's fair opportunity to see if another developer would complete the project. The Settlement Agreement obligated the County to

agree the road was private and to grant a variance to relocate and improve the road. Once Pinckney Point, LLC's option expired, the Settlement Agreement did not prohibit the County from purchasing the point tract. The covenant of good faith cannot impose a duty separate from the terms of the contract itself.

## IV. Remaining Issues

We now turn to the opinion of the court of appeals and the two issues it addressed: evidence of damages and proximate cause.

First, the court of appeals held the testimony of an expert witness presented by Road established—as a matter of law—the value of the road parcel had not decreased because he stated it was still worth $5 million after the County purchased the point tract. After reviewing the testimony in context, however, it is clear the expert was referring to the value of the road parcel if it were still to be used as access to a residential development. More importantly, a jury could easily have inferred this was what he meant, and therefore the court of appeals inappropriately weighed the evidence. *See RFT Mgmt. Co. v. Tinsley & Adams L.L.P.*, 399 S.C. 322, 331-32, 732 S.E.2d 166, 171 (2012) ("When reviewing the trial court's ruling on a motion for a directed verdict or a [judgment notwithstanding the verdict], this Court must apply the same standard as the trial court by viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party." (citing *Elam v. S.C. Dep't of Transp.*, 361 S.C. 9, 27, 602 S.E.2d 772, 782 (2004))). The court of appeals also failed to consider other evidence of the road parcel's value, namely Road's contract for sale with Pinckney Point, LLC and the reduction in purchase price when Pinckney Point, LLC originally bought the point tract. Both of those pieces of evidence would support the jury award of $5 million in damages.

More importantly, even if no evidence supported an award of specifically $5 million, the jury could clearly infer the value of the road parcel was reduced when the point tract was no longer going to be used as a residential community. Ultimately, there was evidence Road was harmed, even if the extent of that harm was unclear. *See Austin v. Stokes-Craven Holding Corp.*, 387 S.C. 22, 43, 691 S.E.2d 135, 146 (2010) ("While neither the existence, causation nor amount of damages can be left to conjecture, guess or speculation, proof with mathematical certainty of the amount of loss or damage is not required." (quoting *Whisenant v. James Island Corp.*, 277 S.C. 10, 13, 281 S.E.2d 794, 796 (1981))). Road's contract for sale with Pinckney Point, expert testimony the highest and best use of the road parcel was as residential access,

and the reduction in purchase price when Pinckney Point originally bought the point tract are all evidence Road suffered *some* damages. If a party presents any evidence it was harmed but that evidence is insufficient to support the jury's particular award, then the proper remedy is not judgment notwithstanding the verdict but a new trial. *See Anderson v. Aetna Cas. & Sur. Co.*, 175 S.C. 254, 281-82, 178 S.E. 819, 829 (1934) ("The authority of a circuit judge to correct, modify, or interfere with the verdict of a jury in a case properly triable by jury is embraced in and limited to the power to grant new trials." (quoting *Gwathmey v. Foor Hotel Co.*, 121 S.C. 237, 241, 113 S.E. 688, 689 (1922))). Therefore, judgment notwithstanding the verdict was inappropriate on the basis Road failed to present evidence of damages.

Second, Road asserts the court of appeals erred in holding Pinckney Point was the exclusive cause of Road's harm due to Pinckney Point's inability to close on and re-purchase the point tract. There can be no doubt Pinckney Point's failure was *a* cause of Road's harm. But it is equally clear—assuming the County breached the Settlement Agreement—the County's purchase and conservation of the point tract was *also* a cause of Road's harm. *See Wickersham v. Ford Motor Co.*, 432 S.C. 384, 394 n.4, 853 S.E.2d 329, 334 n.4 (2020) ("[T]here can be more than one proximate cause of an injury." (citing *Matthews v. Porter*, 239 S.C. 620, 627, 124 S.E.2d 321, 325 (1962)). The jury could have concluded that but-for the County purchasing the point tract, another developer would have eventually bought and developed the land and therefore would have purchased access over the road parcel.

## V. Conclusion

While the court of appeals improperly weighed the evidence, we nonetheless affirm the order granting judgment notwithstanding the verdict because—as a matter of law—Beaufort County could not have breached the implied covenant of good faith and fair dealing in the Settlement Agreement. Neither the purpose nor the terms of the Settlement Agreement could prohibit the County from purchasing the point tract once Pinckney Point's option expired.

**AFFIRMED IN RESULT.**

**BEATTY, C.J., KITTREDGE, JAMES and HILL, JJ., concur.**