UNITED STATES of America,
Appellant,

v.

CROFT–MULLINS ELECTRIC COMPANY, Inc., Appellee.

No. 21116.

United States Court of Appeals
Fifth Circuit.

June 19, 1964.

Rehearing Denied Aug. 3, 1964.

it was alleged the Government was guilty of negligence and misconduct which delayed the contractor's performance causing Croft-Mullins damages to the extent of $9914.98, for which sum it prayed judgment. Jurisdiction was stated to be founded upon that portion of the Tucker Act set forth in Title 28 § 1346 referring to certain claims against the United States not exceeding $10,000.[1]

After answer filed the case was tried to the court without a jury and the court made and filed its findings and conclusions determining that the plaintiff was entitled to judgment in the sum of $9380.44. Judgment was entered accordingly.

The contract upon which suit was brought was executed in the form prescribed by GSA regulations for contracts for the construction, alteration or repair of public buildings or works. It was dated April 26, 1957, and provided that the work should be started May 1, 1957, and completed October 28, 1957. Plaintiff based its claim for damages upon an alleged failure of the Government to furnish materials it was to supply for the job within the time which plaintiff asserted the Government had agreed to supply them. After completion of the contract plaintiff sought an administrative award of damages which the contractor claimed it had suffered. This was denied and this action followed.

The court found that "by the exercise of ordinary and reasonable diligence on the part of the Government, it could have procured all of the items as to which there were delayed deliveries"; that had such ordinary care and diligence been exercised, "all of the items which the contract obligated it to furnish", could have been obtained and furnished on schedule. The court found that "the Government was negligent in failing to deliver all delinquent items, and was also negligent

Alan S. Rosenthal, David L. Rose, Robert V. Zener, Attys., Dept. of Justice Washington, D. C., for appellant.

F. Robert Raley, Macon, Ga., for appellee.

Before TUTTLE, Chief Judge, and POPE * and BROWN, Circuit Judges.

POPE, Circuit Judge.

This was an action brought by the appellee Croft-Mullins Electric Company, Inc., against the United States alleging the execution of a contract between the parties whereby Croft-Mullins agreed to perform certain construction work for the rehabilitation of airfield lighting at an air station at Pensacola, Florida, for which the Government undertook to pay the contractor a stipulated sum.

It was alleged that by the contract the Government undertook to furnish certain materials required for the completion of the job; that the Government willfully failed to fulfill its obligation to furnish material and "neglected its duty in connection with the furnishing of the property it was under contractual obligation to furnish" to plaintiff. In this respect

---

\* Of the Ninth Circuit, sitting by designation.

1. Title 28 § 1346: "(a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of: * * *

(2) Any other civil action or claim against the United States, not exceeding $10,000 in amount * * * upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

in encouraging plaintiff to maintain its forces on the job by promising immediate and early deliveries without knowing that it would be able to make good on its promises of early delivery."

The court found that although work was to commence under the contract on May 1, 1957, and although the contract contemplated that the United States would furnish material and equipment for the job, the furnishing of that material was delayed until seven months after the original scheduled date of the completion of the project during which time plaintiff had repeated requests for the materials which the Government "was obligated under the contract to furnish."

The record shows that pursuant to the provision of the contract which provided that in case of delays due to causes beyond the control and without the fault of the contractor, including acts of the Government, the time for completing the work could be extended; such an extension was granted, and the completion date put forward to August 29, 1958.[2]

Since the action is founded upon a contract which it is alleged the Government has failed to perform, the primary question we must ask is what did the contract require with respect to the furnishing of materials and equipment by the Government. The provisions of the contract in that respect are found in § 52(b) which reads as follows: "The time for completion of the work under this contract is based upon the expectation that the Government-furnished property, if any, as set forth in the specification will be delivered to the Contractor at the times stated, or, if not so stated, in sufficient time to enable the Contractor to perform within the time for completion of the contract work. In the event that the Government-furnished property is not delivered to the Contractor by such time or times, the provisions of Clause 5 respecting an extension of time shall apply. The Government, however, does not warrant or guarantee any time or times for delivery of such property. For any delay in delivery or failure to deliver any or all of the Government-furnished property, the Government shall not be liable to the Contractor for damages, loss of profits, or increased costs; provided, however, that the Contractor shall be entitled to an equitable adjustment, as provided in Clause 3 of this contract, for any change thereunder directing the Contractor to furnish any such property." Relevant to this provision is the provision of § 5(c) relating to delays in the work for which the contractor was not responsible and for causes including "acts of the Government". It provides in substance that in case of such delay, and receipt of notice thereof from the contractor, the Contracting Officer for the Government shall extend the time for completing the work when in his judgment the findings of fact justify such an extension. This portion of the contract is set forth in the margin.[3]

---

2. The record does not show the precise date of completion, but no complaint is made that the job was not completed within the extended time.

3. "5. TERMINATION FOR DEFAULT —DAMAGES FOR DELAY—TIME EXTENSIONS * * * (c) The right of the Contractor to proceed shall not be terminated, as provided in paragraph (a) hereof, nor the Contractor charged with liquidated or actual damages, as provided in paragraph (b) hereof because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, in either its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, or delays of subcontractors, or suppliers due to such causes: *Provided*, That the Contractor shall within 10 days from the beginning of any such delay, unless the Contracting Officers shall grant a further period of time prior to the date of final settlement of the contract, notify the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of the

It will be noted that the portions of the contract here quoted fail to specify any time or times at which the Government was obligated to furnish these materials. In this respect the contract is as silent as was the contract dealt with in United States v. Foley Co., 329 U.S. 64, 66, 67 S.Ct. 154, 155, 91 L.Ed. 44, where the court noted "In no single word, clause, or sentence in the contract does the Government expressly covenant to make the runways available to respondent at any particular time."

It is plain that the trial court must have realized this for the court's conclusions from its findings disclose that it was relying upon an implied promise on the part of the Government to furnish the materials called for within the time specified for completion of the contract. The theory on which the court below pro-

ceeded was stated in its conclusions of law as follows: "Where the obligation of plaintiffs requires an expenditure of a large sum in preparation to perform it and a continuous readiness to perform, the law implies a duty of the other party (including the government) to do whatever is necessary to enable plaintiffs to comply with their promise or covenant. United States v. Speed, 8 Wall 77, 75 U. S. 77, 19 L.Ed. 449." [4]

We do not question but that if the contract here involved simply required Croft-Mullins to install equipment furnished by the Government according to stated specifications and within a stipulated time, it would be proper to construe the contract as containing an implied promise or undertaking by the Government to supply such equipment in time to permit Croft-Mullins to perform.[5] How-

delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal as provided in Clause 6 hereof."

4. This involved a contract between the United States, acting through its War Department, and Speed, whereby the latter agreed to do the work of slaughtering and packing 50,000 hogs. The hogs were to be furnished by the Government. After Speed had slaughtered and packed some 16,000 hogs, the Government refused to furnish the remainder of the stipulated number. It was argued on behalf of the United States that the Government was not bound to furnish to the claimant any given number of hogs. The Court said: "Without entering into a discussion of the general doctrine of the implication of mutual covenants, we deem it sufficient to say that where, as in this case, the obligation of plaintiffs requires an expenditure of a large sum in preparation to enable them to perform it, and a continuous readiness to perform, the law implies a duty in the other party to do whatever is necessary for him to do to enable plaintiffs to comply with their promise or covenant." 75 U.S. at 84.

This rule relating to implied promises deemed incorporated in contracts, oral or written, is one of general application. It is discussed in 5 Williston on Contracts §§ 1293 & 1293a (rev. ed.): "Wherever,

therefore, a contract cannot be carried out in the way in which it was obviously expected that it should be carried out without one party or the other performing some act not expressly promised by him, a promise to do that act must be implied. This principle was thus expressed by Lord Blackburn: 'Where in a written contract it appears that both parties have agreed that something shall be done which cannot effectually be done unless both concur in doing it, the construction of the contract is that each agrees to do all that is necessary to be done on his part for the carrying out of that thing.'" Ibid. § 1293. See Gulf, Mobile & Ohio Railroad Co. v. Illinois Central R. Co., N.D.Ala., 128 F.Supp. 311, 324, aff'd, 5 cir., 225 F.2d 816: "A contracting party impliedly obligates himself to cooperate in the performance of his contract and the law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove." Citing Williston, supra. See also Sacramento Nav. Co. v. Salz, 273 U.S. 326, 329, 47. S.Ct. 368, 71 L.Ed. 663; Guerini Stone Co. v. P. J. Carlin Constr. Co., 248 U.S. 334, 340, 39 S.Ct. 102, 63 L.Ed.2d 275; Murmanill Corporation v. Simkins, 5 cir., 251 F.2d 33, 35.

5. As later indicated, there is some authority indicating that this implied promise is one "not to cause performance to be delayed beyond that time by its negligence."

ever, the difficulty with the implication of such a promise on the part of the Government in this case is that § 52(b) of the formal written contract above quoted contains the specific provision: "The Government, however, does not warrant or guarantee any time or times for delivery of such property."

■ It is elementary that one cannot imply a term or promise in a contract which is inconsistent with an express term of the contract itself. Klebe v. United States, 263 U.S. 188, 192, 44 S.Ct. 58, 68 L.Ed. 244; Hawkins v. United States, 96 U.S. 689, 697, 24 L.Ed. 607.[6]

When we look about to find some promise, express or implied, binding the Government to furnish the material and equipment contemplated at some specific time or within some period we are confronted with the very explicit language above quoted that there is no such obligation. It is also to be noted that within the framework of this contract there was express provision as to the consequences of the delay due to the "acts of the Government". That provision is the one quoted above from § 5(c) to the effect that in that event the contractor shall be entitled to an extension of time for the completion of the contract. We cannot read the contract as providing for any other consequence of the delay on the part of the Government.[7]

The record discloses that Croft-Mullins received the benefits of this provision on two occasions. On December 9, 1957, the performance deadline was extended 59 days to December 26, 1957; and on July 18, 1958, a further extension of 246 calendar days was granted carrying the completion date to August 29, 1958, a total extension of 305 days.[8]

■ Much of the language used in the court's findings, as we have above indicated, refers to the failure of the Government to exercise ordinary care and reasonable diligence. Some of the language sounds as if the court were dealing with a tort claim based on the Federal Tort Claims Act. Of course the plaintiff did not predicate its action upon a tort claim which would have required an examination of the local state law (that of Florida) in order to determine whether the acts or neglects of the Government were committed "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." (Title 28 § 1346(b).

■ If this were to be considered as a case arising under the Tort Claims Act it would meet two serious obstacles. The first is that under Florida law, which would have to be applied, the exculpatory clause would be held valid and a complete defense to a claim based on ordinary negligence. This was noted by this court in Jacksonville Terminal Co. v. Railway Express Agency, Inc., 5 cir., 296 F.2d 256, 261. The court called attention to a collection of Florida cases on this point cited in Ringling Bros.-Barnum & Bailey C. Shows v. Olvera, 9 cir., 119 F.2d 584, 587.

■ It would also appear that plaintiffs would be confronted with the two year limitation on a Tort Claim Action provided in Title 28 § 2401(b), for the acts complained of here occurred in 1957

6. And see also: Tanner v. Title Ins. & Trust Co., 20 Cal.2d 814, 824, 129 P. 2d 383; Straus v. Kazemekas, 100 Conn. 581, 124 A. 234, 239; Cowles v. Morris & Co., 330 Ill. 11, 161 N.E. 150, 154; Commonwealth ex rel. v. Nelson-Pedley Const. Co., 303 Pa. 174, 154 A. 383, 385; Kenan, McKay & Spier v. Yorkville Cotton Oil Co., 109 S.C. 462, 96 S.E. 524, 525, 1 A.L.R. 1387; Aetna Life Ins. Co. of Hartford v. Bidwell, 192 Tenn. 627, 241 S.W.2d 595, 597; Donovan v. McGurrin, 69 Utah 1, 251 P. 1067, 1070; Puget

Sound International Ry. v. City of Everett, 103 Wash. 495, 175 P. 40, 41.

7. From United States v. Foley Co., supra: "This contract, like the others, shows that changes and delays were anticipated and provided for." 329 U.S. at 69, 67 S.Ct. at 156.

8. Although the actual completion was on October 4, 1958, nothing here turns upon the fact that this was later than the August 29 date fixed in the modification order.

and 1958, and the suit was not brought until April 26, 1961.[9]

We are therefore obliged to consider that recovery here must be predicated upon proof of a breach of contract; and the necessity of proving a violation of the contract cannot be avoided by referring to the conduct of the Government as being negligent and lacking in due care. Whether we deal with a simple breach of contract or with a negligent breach of contract there must be shown a violation of some term of the contract or some promise expressed or implied therein.

The trial court appears to have assumed that the Government's defense in this case was predicated upon a second and a different provision in § 52(b) of the contract quoted above. The second provision is as follows: "For any delay in delivery or failure to deliver any or all Government furnished property, the Government shall not be liable to the contractor for damages, loss of profits, or increased costs." This is the clause which appellee refers to as the "exculpatory" clause of the contract. The trial court referred to this as an "exemption-from-liability-for-delay" contract clause. In holding that this particular clause did not relieve the Government from liability in this case, the court cited and relied upon the case of Ozark Dam Constructors v. United States, 130 Ct.Cl. 354, 127 F. Supp. 187.

The pleadings in that case showed that the plaintiff contractors had entered into a contract to construct a concrete dam. The Government was to furnish the cement for the dam. The specifications in the contract provided that the contractor would periodically give 30 days written notice in advance of the date it would require cement, and the shipping dates required as to each type of cement. The contract contained an exculpatory clause similar to the second clause in the present contract to which we have referred. That recited "The Government will not be liable for any expense or delay caused the contractor by delayed deliveries except as provided by Article 9 of the contract." Article 9 provided for an extension of time for completion of the contract in case of delay for causes beyond the control of the contractor. The Government failed to make deliveries of cement during certain months because of strikes on a railroad. However, the court found that the plaintiff's allegations showed that the cement could have been carried by another railroad and by a truck line; that the Government refused to issue an order extending the time for completion of the contract; that it had not been diligent in making deliveries on time, and it had been guilty of negligence and of a complete lack of consideration for the interests of the plaintiffs. Relying upon earlier decisions of the court in similar cases, which had held in line with United States v. Speed, supra,[10] that there was in such cases an implied promise on the part of the Government that it would "not only not hin-

9. The Tort Claims Act, from the beginning, contained a limitation as to the time within which such claims may be brought. See 60 Stat. 842–847. The original one year limitation was subsequently extended to two years, as in § 2401(b) Title 28. Since the limitation was part of the statute creating the liability, the time is an indispensable condition of the liability, whether limitations be pleaded or not. The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358; Midstate Horticultural Co. v. Penna. R. Co., 320 U.S. 356, 64 S.Ct. 128, 88 L.Ed. 96; Finn v. United States, 123 U.S. 227, 8 S.Ct. 82, 31 L.Ed. 128.

Viewed as a tort claim this would not come within the $2500 limitation specified in Title 28 § 2672 nor by the type of claim which could be processed by an administrative order pursuant to that section. See the discussion of that section and of § 2675(b) in United States v. Alexander, 5 Cir., 238 F.2d 314. The administrative action referred to in § 2675(b) is plainly the action upon a claim presented under § 2672.

10. Such earlier cases include George A. Fuller Co. v. United States, 108 Ct.Cl. 70, 69 F.Supp. 409; Kehm Corp. v. United States, 119 Ct.Cl. 454, 93 F.Supp. 620; and Chalender v. United States, 127 Ct.Cl. 557, 119 F.Supp. 186. In none of these cases was there a non-liability provision in the contract.

der [its] promisor's performance" but also "do whatever is necessary to enable him to perform", it held the exculpatory clause, above quoted, void as against public policy.[11]

We need not here consider whether we agree with the holding of the Court of Claims in the first Ozark Dam Constructors case, for its facts are clearly distinguishable from those in the case before us. There the court was proceeding upon the assumption that there was in fact a breach of contract in the failure of the Government to comply with its implied promise to furnish the cement on time. Indeed the jurisdiction of the Court of Claims was dependent upon the determination that there was a breach of contract; and that the action was one sounding in contract and not in tort. Klebe v. United States, supra.[12]

As we view this case the determinative provision of the contract is the first clause we have emphasized under § 52

11. The holding in the Ozark Dam case as to the invalidity of its exculpatory clause there involved, is something original with the Court of Claims. After the Court of Claims, in this decision had denied the Government's motion to dismiss, the case was tried, and on the evidence the court held there had been no proof of negligence, "wilful or even ordinary", saying: "Even in the absence of the exculpatory clause relied upon by the Government, it would not be liable for those damages. United States v. Howard P. Foley Co., 329 U.S. 64, 67 S.Ct. 154, * * * A fortiori, it is not liable when the contract contains the exculpatory clause." 288 F.2d 913, 918.

Evidently the court considered failure to supply the cement on time would not render the Government liable unless such failure was due to negligence on its part. Possibly the court was relying on the language used in the Foley case, supra, as follows: "It is suggested that the obligation of respondent to complete the job in 120 days can be inverted into a promise by the Government not to cause performance to be delayed beyond that time by its negligence. But even if this provision standing alone could be stretched to mean that the Government obligated itself to exercise the highest degree of diligence and the utmost good faith in efforts to make the runways promptly available, the facts of this case would show no breach of such an undertaking." (Emphasis added.)

The first decision in the Ozark case finds no basis in any decision of the Supreme Court. In the case before us there was no finding of willful misconduct on the part of the Government or its representatives,—the finding was the failure to exercise "ordinary and reasonable diligence" on the part of the Government; the Government was "negligent" in failing to deliver, etc.

We know of no general rule that parties to a contract dealing at arms length may not agree that one should save another harmless from simple negligence. As this court said in Philippine Air Lines v. Texas Engineering & Mfg. Co., 5 Cir., 181 F. 2d 923, 925, such a provision is "no more against public policy * * * than an indemnity clause in an insurance policy would be." And see Wells Bros. Co. of New York v. United States, 254 U.S. 83, 41 S.Ct. 34, 65 L.Ed. 148, where the contract provided that the contractor would not make any claim against the Government "for any damages which may arise out of any delay caused by the United States," in the performance of the contract. It was held that this language of the contract prohibited recovery against the United States. The Court said: "Such language disassociated as it is from provisions relating to 'omissions from,' the making of 'additions to or changes in,' the work to be done or 'materials' to be used, cannot be treated as meaningless and futile and read out of the contract. Given its plain meaning it is fatal to the appellant's claim. Men who take $1,000,000 contracts for government buildings are neither unsophisticated nor careless. Inexperience and inattention are more likely to be found in other parties to such contracts than the contractors, and the presumption is obvious and strong that the men signing such a contract as we have here protected themselves against such delays as are complained of by the higher price exacted for the work." 254 U.S. at 87, 41 S.Ct. at 35.

12. "To sustain the contention that the express contract is not binding or enforceable in favor of the government and consequently that its claim here is not well founded would not help the plaintiffs, since then the resulting cause of action would be one sounding in tort and not within the purview of the Tucker Act." 263 U.S. at 192, 44 S.Ct. at 59.

(b), namely, "The Government, however, does not warrant or guaranty any time or times for delivery of such property." The significance of this is that wholly apart from the following exculpatory clause this contract makes it plain that the situation is the same as that referred to in United States v. Foley Co., supra, and requires a like holding here to the effect that in no single word, clause or sentence in the contract does the Government covenant to deliver the materials at any stated time or times, and because of that provision last quoted above no promise to make any such delivery can be implied.[13]

As we have noted, the trial court in its conclusions indicated that it found the duty or obligation of the Government to make deliveries of materials on time by implying such a promise under the theory of United States v. Speed, supra. The findings do contain some other recitals which we now proceed to mention because it is not clear whether the court evolved some non-contract obligation on the part of the United States from those findings. The court found that "The pre-trial order shows * * * that the agents of the Government represented to plaintiff before its bid was made that all materials to be furnished by the Government would either be on hand when notice to proceed was given or would be delivered soon thereafter."

■ The contract was plainly executed by the parties for the purpose of embodying in a single instrument all of the arrangements between them. This is apparent from an examination of the contract itself. The terms of the agreement were thus integrated in the manner referred to by Mr. Wigmore. See 9 Wigmore on Evidence §§ 2425 et seq. (3d ed. 1940). It follows that the prior or contemporaneous oral negotiations between the parties cannot be referred to for the purpose of ascertaining what constituted the agreement between the parties. As this court has had occasion to point out, this rule "is not one of evidence but of substantive law." Ramey v. Koons, 5 cir., 230 F.2d 802, 804 (applying Florida law); Modern Farm Service, Inc. v. Ben Pearson, Inc., 5 cir., 308 F.2d 18, 23, (applying the rule in Arkansas which the court called "the almost universal rule").

■ The result is that even though the prior or contemporaneous oral conversations and negotiations are not objected to or are admitted to have occurred, since the so-called parol evidence rule is one of substantive law, the prior or contemporary conversations are simply immaterial and irrelevant to the question as to what the agreement was. This was well stated in Wootton Hotel Corporation v. North Assur. Co., 3d cir., 155 F.2d 988, 990, as follows: "Under the facts we fail to see how the testimony of Sargent, *even though presented without objection*, can eliminate the parol evidence rule, for despite its name, that rule is not a rule of evidence but one of substantive law. Williston on Contracts, Revised Edition, Section 631. The parol evidence rule as defined by Professor Wigmore is: 'When a jural act is embodied in a single memorial, all other utterances of the parties on that topic are *legally immaterial* for the purpose of determining what are the terms of their act.' Wigmore on Evidence, 3d edition, Section 2425." (Emphasis added.) This court noted the same thing in South Florida Lumber Mills v. Breuchaud, 5 cir., 51 F.2d 490, 493, as follows: "It is a case where if the words relied on were uttered with contractual intent, they were ut-

---

13. The sentence in the contract on which we here base our decision, namely, "The Government, however, does not warrant or guarantee any time or times for delivery of such property," is in no sense an "exculpatory" or "exemption-from-liability-for-delay" clause, as those terms were used in the court below, or in the first Ozark Dam Constructors case. It is plainly a mere definition of what the Government promised, or did not promise. We know of no public policy that prohibits an ordinary contracting party from expressly defining and limiting what it promises to do.

tered as a part of negotiations which in their final constitution took a different form, and therefore are not merely unprovable, *but if proved are wholly immaterial to the issue,* for 'a legal transaction when reduced to writing is now conceived of as constituted, not merely indisputably proved, by the writing.' 5 Wigmore, § 2426." (Emphasis added.) See in accord Anderson v. Owens, 9 cir., 205 F.2d 940, 941–942 (applying Washington law).

It follows therefore that the findings as to what the Government represented before the contractor made its bid have no bearing whatever upon the contractual obligations and rights of the parties; that the fact of these representations was admitted is of no consequence for the whole problem is simply what was the true agreement and this rule of substantive law rules out the prior conversations as constituting any portion of the contract. As this court stated in South Florida Lumber Mills v. Breuchaud, supra, these matters "if proved are wholly immaterial to the issue." 51 F.2d at 493.

 Other similar findings as to representations and assurances are clearly immaterial and irrelevant here upon the question of what the contract of the parties required the Government to do. Thus the findings referred to a letter of July 12, 1957, from a Government representative to plaintiff, in which "plaintiff was assured that all needed materials would be received in the near future." Similar letters of October 7, 1957, and October 21, 1957, the court found were sent to plaintiff by an authorized representative of the Government. There is no finding or contention here that by these letters the formal written contract was modified. Obviously they could not have had that effect.[14] And wholly apart

from the obstacle of the statute of limitations heretofore mentioned, it is plain that if these letters and representations referred to in the findings were sought to be made the basis of a tort claim against the United States, Title 28 § 2680(h) provides that liability under the Tort Claims Act shall not extend to any claim arising out of misrepresentation.

It seems plain that such inconvenience and loss as was suffered by Croft-Mullins in this case are basically attributable to these claimed misrepresentations. During the course of the trial counsel for Croft-Mullins made the following statement: "[I]t seems that it would be a duty here on the Government to find out once these things came up short whether or not they could procure them, and if they found that they could not procure them then certainly it seems that they should have, and I can cite cases to back me that they should have informed the contractor that they could not procure them and that there was going to be a delay so he would not have held these men and equipment on the site, and that is what resulted in the loss here. Had the Government said 'We don't have them. Go on and shut down and we'll call you back when we get these things', then there wouldn't have been any loss here."

 Since there is no basis upon which Croft-Mullins can recover for these misrepresentations, and since the record fails to show any breach of contract on the part of the Government, we must hold that the judgment of the court below must be reversed.

It is so ordered.

JOHN R. BROWN, Circuit Judge (specially concurring):

The Court holds that construing the contract, there was simply no promise, express or implied, on the part of the

---

14. Paragraph 3 of the written contract makes provision for the making of changes in the drawings or specifications of the contract "within the general scope thereof". This paragraph recites that such changes are to be made by the Contracting Officer "by written order". During the course of the performance of the contract two such changes were ordered and agreed to by the contractors. Included in these changes were the extensions of the performance deadline previously mentioned.

Government to furnish the needed materials at some time. It places reversal on the absence of any such promise and not upon the exemption-from-liability clause of § 52(b). It seems to reason also that this contractor's losses were occasioned by prior misrepresentation which goes unrequited because it took place prior to memorializing the agreement.

I am in full agreement with the Court that it does no good to talk in terms of "negligent breach." I would also conceed that a contractor would have an uphill fight in overcoming the rather plain language of the exemption-from-liability clause of § 52(b),[1] especially in view of the provisions imposing an enforceable obligation on the Government to extend the time of performance.

But I cannot possibly see how the Court can conclude that the Government did not promise to supply the needed materials at some time. It is true that the contract expressly stated, "The Government, however, does not warrant or guarantee any time or times for delivery of such property." But to give that phrase literal application is to destroy the entire relationship created by the contract. It makes the whole arrangement meaningless. If there is any one thing clear in this multi-claused contract, it is that under no circumstances was the contractor authorized or permitted to procure the materials on its own. Hence, the work which the Government sought from the contractor, and the work which the contractor bound itself to perform, necessarily contemplated the Government's furnishing the materials. That being so, the Government obviously had an obligation to supply the materials. Two other questions then would follow. The questions would be, first, *when* were they to be supplied? And second, assuming a failure to supply what relief would the contractor have?

The result is that, although the contract expressly states that the Govern-

ment does not warrant delivery at "any time or times," it again makes the whole arrangement meaningless unless the law from a consideration of the entire instrument and relationship reads into the Government's clear obligation, the duty of furnishing the materials within a reasonable time. In that light, I think the emphasized sentence, see text, supra, is really a part of the exemption-from-liability clause. This would tend to make sense and would emphasize the sweeping intention in the so-called exculpatory language (see footnote 1) to rule out the possibility of any recovery by the contractor of damages or other payments in excess of the contractual consideration. This interpretation also accords with well-settled, general contract principles: "Neither a proper interpretation nor a just determination of legal effects can be reached without giving due consideration to all the parts of a contract and all the steps in the transaction of which the contract is a part." 3 Corbin, Contracts § 549, at 193 (rev. ed. 1960).

---

1. Following the emphasized sentence, §
52(b) goes on to state:
"For any delay in delivery or failure to deliver any or all of the Government-

furnished property, the Government shall not be liable to the Contractor for damages, loss of profits, or increased costs * * *."