[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This matter is before the Court on Plaintiffs' actions for rent and associated expenses on two leases with lessee Defendant and on Defendant's Complaint for Declaratory Judgment seeking a declaration of rights and obligations of the parties under the leases.[1] Over several days in December 2003, this matter was tried before this Court sitting without a jury. The parties have submitted post trial briefs and made oral arguments in support of their respective positions.
 FACTS AND TRAVEL
This dispute arises from two commercial leases that were executed as of November of 1999, between Plaintiffs 1500 Mineral Spring Associates, LP (hereinafter "MSA" or "Plaintiff"), and 1800 Smith Street Associates, LP (hereinafter "SSA" or "Plaintiff"), and Defendant Louis A. Gencarelli Sr. (hereinafter "Gencarelli", "Defendant", or "Lessee"). Bennie Sisto (hereinafter "Sisto", "Plaintiff", or "Lessor") is the President and majority stockholder of JASON'S REALTY CORP., the general partner of both MSA and SSA. At all times relevant hereto, Gencarelli had been President, CEO and Chairman of the Board of Bess Eaton Donut Flour Company.[2]
Negotiations between Sisto and Gencarelli began in 1998 when Sandra Salvadore (hereinafter "Salvadore"), the real estate broker for MSA and SSA, presented the subject properties to Tim Londregan (hereinafter "Londregan") of Londregan Real Estate, who then represented Bess Eaton. At that time, Londregan informed Salvadore that Bess Eaton was interested in both sites but could not act immediately. In February 1999, Salvadore once again contacted Londregan at which time Londregan proceeded to bring the subject properties to Gencarelli's attention. Gencarelli personally visited both sites with Salvadore, Sisto, Jason Sisto (Plaintiff's son) and Londregan.
In June 1999, Salvadore contacted Gencarelli and his attorney, Scott Spear, to discuss the properties, at which time Salvadore was informed that Gencarelli was now ready to proceed. Thereafter, the parties exchanged several draft letters with respect to each of the properties. In July of 1999, Salvadore forwarded site maps of both MSA and SSA to Bess Eaton. Peter Huff (hereinafter "Huff"), who was Bess Eaton's Director/Manager of Construction and Architectural Design at that time, was to review the identified Bess Eaton locations/sites and work with the contractors, engineers and attorneys that were necessary to complete the projects. On July 8, 1999, Huff prepared a preliminary sketch/layout (not covering the entire parcel) of the proposed Bess Eaton donut shop on MSA and forwarded it to Salvadore and Gencarelli. On July 19, 1999, Huff prepared a preliminary sketch/layout (not covering the entire parcel) of the proposed Bess Eaton donut shop on SSA and forwarded it to Salvadore. From September 7, 1999, through the latter part of 1999, the parties negotiated and exchanged draft leases regarding the subject properties.
On November 1, 1999, Defendant entered into two five-year leases for MSA and SSA.[3] The Defendant intended to build and operate two Bess Eaton facilities on those sites, and both leases contained a number of identical conditions precedent that were to be satisfied by Defendant and by Plaintiff. The last paragraph of paragraph 1(a) in both leases, and paragraph 1(b) and 1(c) of both leases are identical, and provide as follows:
 "a. It shall be a condition precedent to the Lessee's [Gencarelli's] performance of any obligation Lessee may have as Lessee hereunder that: (a) all the permits and approvals be obtained necessary to construct a drive-thru coffee shop and bakery specifically including the drive-thru capability, the signage and exterior menu, except the condition to operate for 24 hours a day, (b) that Lessor obtain at its expense and deliver to Lessee an environmental assessment report in writing, which is satisfactory to Lessee and Lessee's Lender, (which satisfaction shall not be unreasonably withheld and/or delayed), from a licensed firm selected by Lessor within sixty (60) days after execution of this lease; (c) that Lessor provide a boundary survey which is satisfactory to Lessee, which satisfaction shall not be unreasonably withheld and/or delayed, within (60) days after execution of this lease; (d) that all representations and warranties of Lessor herein are and continue to be true and accurate, (e) that Lessee obtain financing to construct the Building in an amount equal to eighty (80%) percent of all construction costs with financing at commercially acceptable terms and rates within one hundred twenty (120) days after execution of this lease, (f) that Lessee obtain title insurance in a form sufficient to enable Lessee to obtain financing through the grant of a leasehold mortgage to construct and operate the proposed drive-thru coffee and bakery shop.
 b. The Minimum Base Rent Commencement Date shall be one hundred twenty (120) days after execution of the lease or upon Lessee opening for business, whichever is sooner. If the Lessee is unable to satisfy the above contingencies in which event this payment obligation shall cease, and this lease shall become null and void.
 c. The Additional Rent Commencement Date shall be November 1, 1999 and shall be paid from said date through the duration of the lease. If the Lessee is unable to satisfy the above contingencies within the 120 days after execution of this lease this payment obligation shall cease and this lease becomes null and void."
Additionally, the first sentence of paragraph 1(a) of the 1500 Lease also provides:
 "This lease is executed with the understanding and agreement that Lessor, at Lessor's expense, will demolish and remove all existing structures, buildings and improvements on the Demised Premises so the Lessee may construct buildings, fixtures and improvements on the Demised Premises. Lessee shall reimburse Lessor $7,800 for said costs."
The 1500 lease provided for a minimum base rent of $3,500.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000. The 1800 lease provided for a minimum base rent of $3,000.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000.
On November 4, 1999, two cover letters were delivered to MSA and SSA from Defendant, each stating the following:
 "Upon final review of the Agreement [Leases], I gave consideration to the possibility that I may encounter delays in the process of obtaining permits. In the event that I experience delays, court contests or appeals, I will need your agreement to extend the lease commencement date accordingly. The extension would not include the additional rent commencement date."
In response, both MSA and SSA executed their respective cover letter acknowledging that:
 "The content of this letter is acceptable on behalf of [1800 Smith Street Associates, LP or 1500 Mineral Spring Associates, LP as appropriate] and shall be deemed an amendment to the above referenced Land Lease."
Between November 1, 1999 and February 29, 1999, the parties exchanged several letters and corresponded through their respective agents, primarily Huff and Salvadore. The most pertinent of those communications are discussed herein. On December 20, 1999, Salvadore informed Gencarelli that Garafalo had been hired to perform the environmental reports for both Smith Street and Mineral Spring Avenue. Gencarelli acknowledged his acceptance thereof by executing each letter agreement at the bottom after the following language: "The content of this letter is acceptable on behalf of Bess Eaton Coffee Bake Shop and shall be deemed an amendment to the above referenced Absolute Triple Net Bonded Land Lease." Sisto testified that he believed that Gencarelli's acknowledgement on and acceptance of the December 20, 1999 letter agreements meant that he was not going to enforce the 60 day deadline for delivery of the environmental reports.
During the trial, Salvadore testified that in December 1999 or January 2000, she contacted Huff to inquire as to Gencarelli's commitment on the Mineral Spring Avenue site and Huff responded that they were totally committed and to move forward with whatever needed to be done to get the site ready. Additionally, Sisto testified that in December 1999, he also had a conversation with Huff wherein Huff told him that they were going forward with the deal and that they did not want to utilize the existing structures on Mineral Spring. Sisto further testified that in reliance on the above-stated conversations with Huff, in January 2000, MSA demolished and removed the existing brick buildings/structures from the Mineral Spring Avenue property, and re-graded the site for construction.
On February 14, 2000, Salvadore met with two engineers from Garofalo at the Mineral Spring Avenue site, who were performing the Phase I site evaluation. At this time, Garofalo recommended that a Phase II subsurface investigation be performed on Mineral Spring Avenue because it was discovered that a gas station previously located on another piece of property upgrade from the Mineral Spring Avenue site had a leaking underground storage tank. During the trial, Salvadore testified that she telephoned Huff to inform him of the Phase II evaluation being performed and to ask Huff whether he wanted a written copy of the completed Phase I report. According to Salvadore, Huff told her "no" and to just go ahead with the Phase II evaluation. On February 24, 2000, the Phase II evaluation was being conducted. Salvadore testified that while she was at the Smith Street site, she telephoned Huff to inform him that Phase II was being performed on both properties that day and Huff expressed his pleasure with the progress. Salvadore's recollection of her telephone conversations with Huff is consistent with Gencarelli's testimony during trial in which he stated that receiving the written environmental reports on Mineral Spring Avenue and Smith Street within the 60 day time period set forth in the leases was not important to him.
Also, in February of 2000, the parties resumed correspondence relating to the obtaining of the necessary permits and approvals. By correspondence dated February 16, 2000, corporate counsel for Gencarelli/Bess Eaton, Scott Spear, told Salvadore to contact Attorney Ferrucci, who was engaged by Gencarelli to provide legal services with respect to the permitting process, and work directly with him on the permitting aspects of the projects. On February 17, 2000, Salvadore advised Huff, Attorney Spear and Attorney Ferrucci that the North Providence Town Planning Board Director had reserved two spots for the Smith Street and Mineral Spring Avenue proposals on the Planning Board's February 22 meeting Agenda, and that Bess Eaton needed to submit "something" to him. In response, Huff put together informational packages for each site, which were ultimately submitted to the Planning Board at its February 22, 2000 meeting. The sketch contained in the Smith Street package was the same sketch that was previously prepared by Huff on July 19, 1999 during negotiations between the parties. Likewise, the sketch contained in the Mineral Spring Avenue package is the same sketch that was previously prepared by Huff on July 8, 1999, during negotiations.
At the Planning Board's February 22 meeting, Huff made his presentation regarding each of the projects. The Planning Board took no formal action at this time because there was not a quorum present at that meeting. The matters were continued to the next meeting of the Planning Board, to be held on March 13, 2000. During the trial, Gencarelli testified that he was informed that the Planning Board reacted favorably to the projects, even though they could not take action.
Shortly before the end of the 120-day period set forth in the leases, Sisto sent invoices to lessee for each property, reminding Gencarelli of the rent commencement date and charging rent on each lease as of February 29, 2000. On February 29, 2000, Termination Notices were sent from Gencarelli to SSA and MSA that purported to exercise Gencarelli's right to terminate the 1500 lease and the 1800 lease. Gencarelli bases his right of termination on the fact that all conditions precedent referenced in the leases were not accomplished within the 120 day time frame set forth in the leases.
 PLAINTIFF'S ARGUMENT
The Plaintiff-lessor contends that the letters exchanged between the parties constituted a modification to each of the leases, evidencing the parties' intent not to be bound by a strict adherence to the 120 day period set forth in paragraph 1 of the leases. Lessor argues that the amendments to the leases clearly demonstrate that time was not of the essence and therefore, the lessee was not justified in terminating the leases because all of the conditions in the leases were not performed within the original 120 day time period. Furthermore, lessor asserts that even if Defendant did not expressly waive all of the time provisions set forth in the leases, Defendant's behavior up until his letter terminating the leases, was indicative of someone who intended to be bound by the leases and was satisfied with the progress being made.
While lessor concedes that he sent a bill for the base rent due 121 days after execution of the leases, lessor asserts that the bill for rent was a separate act that was not dependent upon the 120 day time period set forth in the leases, as these time limits had already been waived by the parties. Lessor maintains that even if the 120 day time period was not expressly waived by the amendments to the leases, lessee's actions manifested an implicit waiver of the 120 day time constraint in the leases. Consequently, the bill sent by lessor with regard to the properties in question was an independent act that did not carry with it any meaning other than to notify the lessee that the due date for the minimum base rent was upon them. Additionally, lessor posits that he would have been willing to adjust the due date for the minimum base rent had the lessee opted to engage in discussions with the lessor regarding this matter. It is lessor's contention that up until the point that lessee informed lessor that he was terminating the leases, negotiations between the parties were extremely amiable and making additional accommodations had never posed a problem.
Furthermore, lessor argues that lessee should be held responsible for the rent on the lease because he did not fulfill his duty to use good faith, diligence and best efforts to obtain the necessary approval and permits within the 120 day time period. Lessor maintains that the provision allotting the lessee 120 days to secure financing before either party could terminate the lease assumed that the lessee would make reasonable efforts to secure said financing. Thus, even if the 120 day time period had not been waived by the parties, lessor contends that lessee would still be obligated to pay the rent on the leases, as the lessee did not even attempt to fulfill the condition pertaining to the 120 day time constraint.
Finally, lessor maintains that lessee should bear the costs incurred as a result of the demolition of the structures on the Mineral Spring Avenue site. Lessor argues that he reasonably relied on the representations of lessee and Huff that lessee had every intention of going forward with the leases, irrespective of any time frames originally set forth in the leases.
 DEFENDANT'S ARGUMENT
Conversely, Defendant-lessee argues that when the conditions precedent were not accomplished within the 120 day time period set forth in the leases, the lessee's obligations to pay rent automatically ceased, and both leases became null and void. It is lessee's contention that the 120 day time period allotted in the leases was a strict time limit within which all of the conditions precedent set forth in the leases needed to be performed. Lessee asserts that because he was unable to obtain financing within 120 days following execution of the leases, under the terms of the agreements, his obligations under the leases automatically ceased. While the lessee does not contest that he was obligated to make reasonable efforts to obtain financing within the 120 days, as per the agreements, he maintains that the lessor's failure to perform certain contingencies, namely providing environmental assessments and boundary surveys in a timely manner, prevented him from obtaining financing within 120 days of execution of the leases, the nonoccurrence of which voided the agreements.
Moreover, lessee maintains that the lessor's bill for the base rent on the 121st day after execution of the leases undermines the lessor's position that the 120 day time provision in the leases was waived or modified by the parties. Lessee contends that if the lessor truly believed that the parties were no longer bound by the 120 day time period then lessor would not have sent out a bill for the rent exactly 120 days after execution of the leases, as provided for in §§ b and c of the leases. It is lessee's position that the lessor's partial adherence to the aforementioned provisions, subsequent to the passage of the 120 day time period set forth in the leases, is demonstrative of the fact that lessor intended to be bound by these provisions, regardless of any amendments made to the 60 day time period allotted for environmental assessments and boundary surveys.
Furthermore, it is lessee's contention that he should not be held responsible for the costs incurred due to the demolition of the structures on Mineral Spring Avenue because lessor was aware that under the terms of the lease, lessee's obligations on the leases would only be triggered if all conditions precedent were accomplished within the 120 day time frame set forth in the leases.
 DISCUSSION
The Rhode Island Supreme Court has repeatedly held that contracts which include provisions relating to performance at a fixed time are to be given a reasonable construction by the court, with regard being given to the surrounding circumstances and the parties' manifested intent. Safeway System, Inc. v.Manuel Bros., Inc., 228 A.2d 851, 856 (R.I. 1967); Furlong v.Barnes, 8 R.I. 226 (R.I. 1865). "A contract is not to be construed like a railway time-table." Furlong, 8 R.I. at 229. Additionally, when construing a contract that includes a provision relating to time limits, the burden of proof falls upon the party contending that time is of the essence. Sal'sFurniture Co. v. Peterson, 133 A.2d 770, 773 (R.I. 1957).
In the present case, lessee has not demonstrated to this Court that time was of the essence in the lease agreements at issue. Although the leases do give a specific time frame for the completion of certain conditions, there is no explicit language in the leases themselves suggesting that these time frames are material or essential to the agreements. Moreover, the amendments to the leases, in which the lessee himself requested leniency if he needed additional time to obtain permits and approvals, further suggests that the parties did not view the time element to be strict in nature.
This Court rejects lessee's position that language stating that the leases shall become null and void if the terms of the leases are not satisfied possess equivalent or even stronger meaning than the phrase "time is of the essence" because they signify an automatic nullification of the leases if the conditions do not occur within the 120 day time frame. Most contracts contain language that the contract will become null and void if the parties do not act consistently with the terms of the lease. That in itself however, does not suggest that time is of the essence. "That the parties to a contract intended to make time of the essence may appear by express stipulation therein or it may be found in the nature or purpose of the contract or in the circumstances under which it was made. There must, however, be some evidence from which such intent can be ascertained, and the party contending that time is of the essence of the contract has the burden of proof thereon." Sal's Furniture Co.,133 A.2d at 773.
Moreover, lessee's argument completely ignores the fact that he implicitly waived all time limits in the leases by voluntarily continuing with the contracts long after the 60 day time limit had not been met. "`A written contract may be waived in whole or in part, either directly or inferentially, and the waiver may be proved by express declarations manifesting the intent not to claim the advantage, or by so neglecting and failing to act as to induce the belief that it was the intention to waive."Fairbanks, Morse Co. v. Nelson, 217 F. 218 (9th Cir. 1914). In the case of Welsh v. Dick, 84 A. 769 (Pa. 1912), the court declared: "The right to insist upon time as the essence of a contract may be waived as effectually by implication as by express agreement, and whether there has been an implied waiver in any case depends upon whether the conduct of the party seeking to invoke the strict provision of the contract had been such as to lead the other party to believe he would not be held to it, but might, notwithstanding it, proceed to perform." Although, lessee attempts to distinguish the 60 day time limit from the 120 day time limit by arguing that the 120 day time limit was more absolute, the facts of this case do not indicate that lessee made any such representations to that effect at any time throughout the parties' transactions.
Furthermore, "it is both elementary as well as fundamental law that where parties contract and make performance conditional upon the happening of an occurrence of a particular matter, the contract imposes upon the party required to bring about the happening of that occurrence an implied promise to use good faith, diligence and best efforts to bring out that happening."Bradford Dyeing Associates, Inc. v. J. Stog Tech GmbH.,765 A.2d 1226, 1237-38 (R.I. 2001) (citing United States v.Croft-Mullins Electric Co., 333 F.2d 772, 775 n. 4 (5th Cir. 1964)) (quoting Gulf, Mobile Ohio Railroad Co. v. IllinoisCentral Railroad Co., 128 F. Supp. 311, 324 (N.D. Ala. 1954)). In the present case, lessee made no attempts to secure financing for the properties within 120 days after execution of the leases. This Court rejects lessee's argument that he was prevented from fulfilling this condition due to the lessor's failure to provide environmental assessment reports and boundary surveys in a timely manner. If it truly was lessee's intent to be lenient with regard to the 60 day time constraint while enforcing a strict 120 day time limit, then it was the lessee's responsibility to clarify this when he realized that the lessor was not going to provide the necessary documents which would allow lessee to secure financing within the 120 days initially allotted. Rather than making lessor aware of the fact that "time was of the essence", a term absent from the lease itself, however, lessee's behavior suggested that the original time constraints in the leases were unimportant. It is clear to this Court, that lessee knew well in advance of the 120th day following execution of the leases, that financing would not be secured in the time allotted in the leases.
In a recent case with facts very similar to the facts before this Court, the Rhode Island Supreme Court affirmed the trial court's finding that where conditions are made part of a contract, it is assumed that the parties to the contract will utilize good faith and due diligence in order to accomplish those conditions. See Ray LaCroix v. David F. Walker, 819 A.2d 1244
(R.I. 2003). This is especially true where the conditions in a contract particularly benefit or shield one party, as it is mutually assumed that the party for whom the condition is intended to protect will be using his best efforts to accomplish those conditions. See Safeway System, Inc., 228 A.2d at 853. In LaCroix, the parties entered into a five-year lease for three units in a building with the express purpose of operating a gym in the space leased. LaCroix, 819 A.2d at 1245. The lease included an express condition precedent which made the terms of the lease contingent upon the lessee's being able to obtain a license to operate a gym in the leased facility. Id. When the lessee and his architect could not reach an agreement regarding the removal of unit partitions, however, the lessee never applied for a license to operate the gym. Id. The Supreme Court declared that it was reasonable for the trial justice to conclude that the lessee breached the contract by failing to take "all necessary steps" to obtain a license, where the term "all necessary steps" meant that lessee was required to "at a minimum, submit a floor plan and apply to Gold's Gym for a license." Id.
at 1246-47.
Lessee attempts to distinguish the facts in LaCroix from the facts in this case by arguing that in this case the conditions lessee had to fulfill were contingent upon the lessor's completion of its conditions. This argument does not have merit since the lessee implicitly waived the time limit for completion of the environmental assessments and boundary surveys and continuously acted in a manner that would lead a reasonable person to believe that he was not concerned with when those acts were to be performed. Here, lessee not only gave no indication to lessor that the 120 day time frame was still in effect, lessee also turned down the opportunity to secure financing when it presented itself.[4] Thus, it is apparent to this Court that lessee failed to use his best efforts in order to achieve the conditions within the 120 day time frame he depends on for nullification of the leases.
Additionally, lessee testified at trial that he was displeased when he realized that under the terms of the leases he was obligated to begin paying rent on the properties themselves before he had obtained all of the necessary permits and approvals from the Town of North Providence to build the donut shops. There is little question that Defendant viewed the parties' failure to adhere to the original terms of the agreements as an opportunity to terminate the leases and escape from what he viewed to be two disadvantageous commitments. During Defendant's deposition, Defendant conceded that he did not realize when he entered into the leases that under their terms he would potentially have to begin paying rent on the properties before he had obtained permits for the Bess Eaton facilities. However, Defendant's displeasure with the agreements he made, no matter how disadvantageous, did not absolve him of his duty to act in good faith and to use his best efforts to timely obtain the permits and approvals in order to satisfy the conditions in the leases.See Bradford Dyeing Associates, Inc., 765 A.2d at 1238.
Although lessee had numerous opportunities to inform the lessor of his intent to disengage himself from the leases if all conditions were not accomplished by the 120 day mark, lessee and Huff engaged in several acts that were directly contrary to that intent. As of February 16, 2000, lessee's legal counsel had not yet filed the pertinent applications with the Town of North Providence and it was only due to the initiative of lessor and his real estate agent that the projects were placed on the agenda for the February 22, 2000 meeting for the North Providence Planning Board. That meeting was held only seven days preceding the 120 day deadline, yet none of the actions taken by lessee or those acting on his behalf indicated that there was any intent on the part of lessee to terminate the leases if all the conditions in the leases were not satisfied by the 120 day mark. At no time before, during or after this meeting, did either Huff or Ferrucci approach Sisto and inform Sisto of any urgency in obtaining approval for the permits and applications because the 120 day deadline was approaching. Lessee's complete failure to notify lessor of his intent to act in accordance with the 120 day time frame set forth in the leases when it was clear that the parties were not acting under that assumption for quite some time, served as an implicit waiver of the 120 day deadline. A contract deadline may be expressly or impliedly waived by acts, words or conduct inconsistent with the deadline. CBS, Inc. v. Merrick,716 F.2d 1292, 1295 (9th Cir. 1983)
With respect to the demolition costs incurred by lessor from the work done on the Mineral Spring Avenue site, this Court finds that lessor reasonably relied on Huff's statements in December 1999, that Defendant intended to follow though on the leases and wanted the structures on the Mineral Spring Avenue property taken down. At no time did lessee or Huff inform lessor that lessee did not intend to pay the expenses incurred as a result of this demolition if all conditions precedent were not accomplished within the 120 day time frame. A plaintiff's reliance upon a vague promise can be viewed as reasonable and justified, if the plaintiff had sufficient reason to believe that the defendants' commitment to an oral contract modification had been made. SeeGBM Acquisitions, Inc. v. Susan Adams d/b/a The WaterfrontCafe, 823 A.2d 1121, 1124 (R.I. 2003)
In the present case, several conversations between the parties supported lessor's objectively reasonable belief that both the 60 day deadline and the 120 day deadline had been mutually waived by the parties. Consequently, lessor had no reason to suspect that lessee was planning to extricate himself from the leases if the 120 day time deadline was not met. Moreover, lessee's assertion that it was lessor's choice to demolish the buildings before the 120 day deadline completely ignores the fact that in order to conduct a comprehensive environmental assessment of the properties as they would be when delivered to lessee, all unwanted structures needed to be removed in advance of the 120 day time frame.
 FINDINGS OF FACT AND CONCLUSIONS OF LAW
Accordingly, after careful review of all the evidence introduced, the testimony of the witnesses and memoranda submitted by the attorneys, the Court makes the following findings of fact and conclusions of law.
1. On November 1, 1999, each of the Plaintiffs, MSA and SSA, entered into a commercial Absolute Triple Net Bonded Land Lease with Defendant Gencarelli, collectively referred to as the Leases. Both leases are for a five-year period, commencing on March 1, 2000, with the option of renewal.
2. On November 4, 1999, the parties agreed via cover letters, to amend the leases to include an agreement that if lessee encountered delays in the process of obtaining permits, the lease commencement date for the minimum base rent would be extended accordingly. These amendments were made at the request of Defendant Gencaralli.
3. The 1500 Lease provided that Lessor, at Lessor's expense, would demolish all existing structures on the Demised Premises for the Lessee's benefit, and Lessee would reimburse Lessor $7,800 for said costs. See, supra, Facts and Travel.
4. Both leases contained specific conditions precedent to any performance obligation of Defendant Gencarelli as Lessee. See, supra, Facts and Travel.
5. The 1500 Lease provided for a Minimum Base Rent of $3,500.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000. The 1800 Lease provided for a Minimum Base Rent of $3,000.00 payable on the first day of each calendar month for the first five-year period, commencing on March 1, 2000.
6. On February 29, 2000, written notices were sent from Gencarelli to SSA and MSA that purported to exercise Gencarelli's right to terminate the leases. In each of the Termination Notices, Gencarelli asserted that the alleged failure to satisfy the lease contingencies "automatically voids the lease."
7. Prior to receiving the Termination Notices, Sisto had Invoices sent to Gencarelli for both Smith Street and Mineral Spring Avenue to remind Gencarelli of the minimum base rent commencement date under the leases.
8. Defendant Gencarelli, through his actions and the actions of those acting on his behalf, implicitly waived the 60 day time limit for the production of environmental assessments and boundary surveys, and the 120 day time limit for the securing of financing.
9. The phrase "time is of the essence" is not present in the leases and Defendant's behavior suggested that the original time constraints in the leases were flexible.
10. Defendant knew, or should have known well in advance of the 120th day following execution of the leases, that financing would not be secured in the time allotted in the leases.
11. Defendant breached his implied duty to act in good faith, with due diligence, and to use his best efforts to fulfill his conditions within 120 days after execution of the leases.
12. Up until the time that he sent the termination notices, Defendant, and all those acting on his behalf, manifested an intent to carry through on the leases, regardless of any time provisions originally set forth in the leases.
13. Plaintiffs reasonably relied on Defendant's actions in demolishing the structures on the Mineral Spring Avenue property, in accordance with the 1500 Lease.
14. Plaintiffs have tried to mitigate damages by attempting to sell and/or lease the Mineral Spring Avenue property and the Smith Street property. Despite their marketing efforts, however, they have been unsuccessful in consummating a sale or lease thus far.
15. Plaintiffs have satisfied the Court by a preponderance of the evidence that they are entitled to rent due under the two leases and demolition costs associated with the Mineral Spring Avenue property.
Accordingly, the Court finds for the Plaintiffs and orders Defendant to pay the Minimum Base Rent on both leases for the period commencing on March 1, 2000 through the present date, $3,500 per month under the 1500 Lease and $3,000 per month under the 1800 Lease. Defendant is also ordered to pay the Additional Rent (i.e. taxes and insurance costs/expenses) on both leases for the period commencing on November 1, 1999 through the present date. Additionally, Defendant is hereby ordered to pay for the demolition costs associated with the 1500 Lease in the amount of $7,800. Plaintiffs are entitled to recover from Defendant reasonable attorneys' fees and expenses incurred as a result of Defendant's default under the Leases.
Counsel shall prepare an order consistent with this decision.
[1] The Plaintiffs actions are de novo appeals from the District Court which awarded judgment for Plaintiffs.
[2] It should be noted that in 2002, Defendant Gencarelli did not act as president of Bess Eaton. During 2002, the president of Bess Eaton was George Cioe. After 2002, Gencarelli resumed his position as president of Bess Eaton.
[3] The rent provisions in the leases state they are applicable for the "first five-year period, commencing on March 1, 2000."
[4] In January 2000, Salvadore, Gencarelli and his son, Paul Gencarelli, met with a representative of NE Realty Resources, Inc., a financing source, at Bess Eaton in Westerly. NE Realty ultimately proposed financing to Bess Eaton to fund several of its projects, including the Smith Street and Mineral Spring projects, which had been discussed at their meeting. By correspondence to NE Realty dated January 31, 2000, Gencarelli declined the financing proposal stating "we have already secured sufficient financing to complete our development objectives for the next twelve months." This correspondence between Gencarelli and NE Realty evidences the fact that Gencarelli was not in a rush to secure financing within the 120 day time frame and that he was aware that he would be able to secure financing for these two projects.